HAMILTON *v.* STATE, 35 Miss. R., 214.

### LARCENY.

To constitute the offense of larceny, it is not necessary that the taking should have been *causa lucri*—it is sufficient that the taking were fraudulent and with intent to deprive the owner of his property. Review of common law authorities on this point.

Under the act of 1856, exception to the sufficiency of the proof of venue must be taken at the trial in the court below, or the point will not be available here.

Error to circuit court of Adams county. POSEY, J.

*G. H. Wilcox*, for plaintiff in error,

Cited, The State v. Hawkins, 8 Porter, 461.

*T. J. Wharton*, attorney general,

Cited, Randal v. State, 4 S. & M.; Coon v. State, 13 ib., 249.

HANDY, J.:

The plaintiff in error was indicted and convicted, in the Adams circuit court, for stealing a slave.

The evidence in support of the indictment, offered on the trial, was to the following effect:

John A. McGill testified that the slave was his property, and that he left his plantation about the 12th of March, 1856; that his overseer had given the slave a *pass* to go to St. Joseph, Louisiana, on the steamer Princess, witness being at St. Joseph at the time, but that the slave did not go there; that the ac-

cused, before the slave left, was employed by witness on his plantation as a clerk, and knew the slave; that in April following, witness received a letter from Richmond, Virginia, giving a description of a slave, then in jail there, corresponding in description with the witness' slave, and stating also that the accused had been arrested; that witness went to Richmond about the 1st of May following, and found the slave in jail there, as was also the accused; he had but very little conversation with the accused, but recollects that the accused told him that he got into a skiff with the slave above Biggs, further above the Homochitto River, or at the shanty on Old River, which shanty was in —— county; that the slave was a very smart and keen negro, and had a good deal of money about him when he left, belonging to witness.

Charles S. McAlister testified that he went to Virginia with the governor's requisition to bring the accused from the Richmond jail to Natchez; that the accused told him that he had got into the skiff with the slave at Old River; that they went to New Orleans and to Mobile, where the accused had to pay something to the custom-house; that they proceeded through the state to Richmond, Virginia; that the accused never claimed the slave to witness as his property. And this witness also testified to certain statements of officers in Virginia with reference to the arrest of the accused there; but these declarations were ruled out as hearsay evidence. This was all the evidence.

The following instructions were asked in behalf of the accused:

1st. The jury must believe, from the evidence, that the defendant did take, steal, and carry away, feloniously, the negro Warner, the property of McGill, otherwise they will find for defendant.

2d. There must be proof that the defendant's intention was to appropriate the said negro to his own use, and to deprive the owner wholly of him.

3d. All hearsay testimony is inadmissible, and the jury must not consider such in making up their verdict.

4th. If there is any reasonable doubt of the guilt of the defendant, the jury must acquit.

A verdict of guilty was returned, and a motion was made, in behalf of the prisoner, for a new trial: 1st, Because the verdict was against the law and the evidence; 2d, Because the jury did not regard the instructions of the court on the part of the defendant. This motion was overruled, and a bill of exceptions was taken, setting out the evidence and proceedings as above stated; and upon that the case is brought here.

We will proceed to consider the errors urged in behalf of the plaintiff in error.

First. It is objected that it does not appear by the record whether the court below made any disposition of the instructions asked in behalf of the accused, either granting or refusing them. These instructions must either have been granted or refused. If granted, the plaintiff in error cannot complain. If refused, it was his duty to except thereto, in order to enable him to avail himself of the objection in this court; and having taken no exceptions to the action of the court below in relation to the instructions, we cannot judicially notice the proceedings below upon that point.

But it is clear, from the motion made by the accused for a new trial, that the instructions asked in his behalf were granted. For one of the grounds of that motion is, that the jury did not regard those instructions; and this, being a part of the same bill of exceptions in which the instructions are set out, explains the silence of the previous part of the bill, and shows that the instructions were, in fact, granted. There is, therefore, nothing in this objection.

Second. It is insisted that the evidence was not sufficient to support the verdict, because there was no evidence whatever to justify the jury in finding that the offense was committed in Adams county; and, on this ground, that the new trial should have been granted.

The record does not show that the point of the insufficiency of the evidence to prove the *venue* was made in the court below; and the statute is positive and express that an objection on that point shall not be entertained in this court un-

less it appears by the record that exception was taken in the court below on the point. Acts of 1856, ch. 26. It is, however, insisted that the point must be considered as having been made in the court below, because it is embraced in the general ground of the motion for a new trial, that the *verdict was against the evidence;* the verdict being against the evidence, when there was no proof of the material fact that the offense was committed in the county in which it was charged in the indictment to have been committed. But this view is, manifestly, not reconcilable with the provisions of the statute. It expressly enumerates sundry things, necessary in the course of a criminal prosecution, which shall be presumed to have rightfully done (although the record does not show that they were done), unless it shall appear by the record that exception was taken upon the particular point in the court below; and it provides that no judgment, after verdict, shall be reversed or set aside, by reason of any such defect in the matters enumerated, unless the record shows that exception was taken upon the point in the court below. The point of the proof of *venue* is one of the matters enumerated; and it is clear that the legislature intended that no objection should be entertained in this court on that ground, unless it be shown by the record that the objection was made in the court below. The reason and policy of the statute, doubtless, were mainly to prevent the reversal of judgment in this court, by reason of clerical omissions and inaccuracies in making up records in the circuit courts, in relation to matters of such importance as to create the presumption that they were rightly done; and because of the great improbability that if they had not been done, exception would have been distinctly made on that ground. But the position taken in behalf of the plaintiff in error is in opposition both to the letter and spirit of the statute.

Thirdly. It is insisted that the evidence is altogether insufficient to establish the charge of larceny; that there is nothing tending to show a conversion, or intention to convert, the slave to the prisoner's use, and no asportation; and that the evidence merely shows that the prisoner accompanied the slave in his escape from his master, making use of the money which the slave

had for his own convenience; and, at all events, that he was merely aiding the slave in his escape from his master, without any intention of appropriating him to his own use.

There can be but little doubt, from the evidence, but that the prisoner was instrumental in taking and carrying away the slave; and it was a question to be determined by the jury, from all the facts and circumstances of the transaction, with what intention the prisoner acted. In determining that question, his conduct must be resolved upon of three hypotheses:

1st. That he was merely traveling with the slave, who was making his escape of his own accord, and without the prisoner's assistance, and making use of the slave's money as a means of traveling.

2d. That he was aiding the slave in his escape to a state where slavery was not allowed, and to that end was acting as his owner during his flight.

3d. That he was taking him away with the real intention of converting him to his own gain.

1. The first view is not sanctioned by anything in the evidence; for it is not shown that he was traveling on any business, or that he had any occasion to travel the same route which the slave took; and it is, therefore, strange that he should travel in company with the slave, giving him no assistance in making his escape, and merely for the purpose of availing himself of the money which the slave had, as a means of traveling. According to this hypothesis, he was traveling without an object, and in company with a slave, whom he knew to be making his escape from his owner. Such an explanation of his conduct is altogether improbable.

2. The evidence would have fully warranted the jury in finding that the prisoner was not merely aiding the slave in escaping to a non-slaveholding state, in order to become free there; for it appears that instead of taking him to such a state, as he might readily have done by the Mississippi river, he took him to New Orleans and Mobile, and through the heart of the slaveholding states to Virginia, the most improbable route he could have taken to get him to a non-slaveholding state.

But if he admitted that he took away the slave from his

master, intending to take him to a state where slavery was not allowed, and set him free, thereby depriving the master of him, we think that it was larceny. It was a wrongful taking and carrying away of the personal property of the master, from his possession, with a felonious intent to convert it to his own use, without the owner's consent.

The rule is now settled, that it is not necessary, to constitute larceny, that the taking should be in order to convert the thing stolen to the pecuniary advantage or gain of the taker; and that it is sufficient if the taking be fraudulent, and with an intent wholly to deprive the owner of his property. Roscoe Crim. Ev., 533 (2d edit.), Cabbage's case; Russ. & Ry., 292 (1 Eng. C. L. Rep.); King v. Morfet, ib., 307. And it is said by the commissioners of criminal law in England, that " ulterior motive, by which the taker is influenced in depriving the owner of his property altogether, whether it be to benefit himself or another, or to injure any one by the taking, is immaterial."

This rule we consider to be in accordance with the principle on which the law of larceny rests, which is to punish the thief for wrongfully and feloniously depriving the owner of his property. The reason of the law is to secure a man's property to him; and that is to be carried out, rather by punishing the thief for feloniously depriving him of it, than for the wrongful gain he has made by the theft. The moral wrong is founded in the wrongful and felonious deprivation.

Upon this principle, if a slave be feloniously taken from his master's possession, with the intent of being removed to a state where he will become free, and the act is accomplished, the criminal intent would be as great, and the loss to the master the same, as if he were taken by the felon to parts unknown and sold for his own gain. It may, with equal propriety, be said in both cases, that the thief converts the property to his own use, so far as the loss to the master is concerned,—in the one case accomplishing his purpose of depriving the master of his property, by setting him free, and placing him beyond his reach; in the other, effecting the same end by selling the slave beyond his reach. In both cases, the moral wrong and the

invasion of private right are the same; and it makes no difference, with reference to public justice against the offender, whether he was actuated by the motive of false philanthropy, or of private gain.

A case has been cited from Alabama, decided upon a statute similar to ours, holding that the taking under these circumstances would not be larceny. State v. Hawkins, 8 Porter, 461. That case proceeds upon the view, that in order to constitute larceny, the taking must be *lucri causa;* and the well established rule above mentioned is rejected as unsound. No reason is shown in that case against the established doctrine, and we are satisfied that the rule there sanctioned is unsound in principle, and impolitic in practice.

But the court in that case, brings in aid of the rule held by it, that there was a statute of that state, as well as in other southern states, making it criminal for any to take a slave, without the consent of his owner, beyond the limits of this state, with intention to defraud or deprive the owner of the slave, in addition to the statute against stealing slaves; and hence concludes that taking a slave out of his owner's possession into another state, for the purpose of setting him free, would fall under the first statute, and not under the latter. We have a statute in this state similar to the latter. But it is manifest that this statute was intended to apply to cases of unlawful and fraudulent removal of slaves beyond the state, with the intention to defraud or deprive the owner of his property, where the taking was not clandestine and felonious; and it has no application to a case, where the taking was done with a felonious intent to make such use of the property removed as to deprive the owner of all benefit of it.

3. But the facts of the case, appearing in evidence, are sufficient to sustain the verdict, on the hypothesis that the prisoner took the slave, treating him as his own property, and for the purpose of converting him to his own gain.

The exercise of ownership is shown by his own acknowledgment, that he paid money for him at the custom-house at Mobile, and that he went with the slave to New Orleans, and to Mobile, and thence through the states to Richmond, Virginia.

If his acknowledgment, in relation to the payment of money at the custom-house, be considered. as false, still it serves to show that he exercised control over the slave; and apart from this, it is in the highest degree improbable that he could have passed through all the states referred to, in company with the slave, without treating him as his property.

It is not improbable that he held out hopes of freedom to the slave; but if so, it is exceedingly improbable that he really intended to set him free, or to take him to a state where he would become free; for his conduct is altogether inconsistent with such a purpose. Instead of taking a course reconcilable with such an intention, he took a directly contrary direction, to the city of Richmond, well known as a large slave mart, and where he might very probably be able to sell him beyond the reach of detection or pursuit.

These circumstances were sufficient to warrant the jury in finding that he took the slave away for the purpose of selling him. The question of intention was fairly submitted to them by the instructions, and it was their province to determine, from all the circumstances, whether the taking was with this intention. If their verdict was found under the belief that the prisoner took the slave, either with this intention, or with that of taking him to a non-slaveholding state, in order that he might become free, the evidence is sufficient to sustain the verdict.

Judgment affirmed.