## STATE v. ALLEN.

No. 3428. Decided March 31, 1920. (189 Pac. 84.)

1. LARCENY—INTENTION TO BENEFIT BY TAKING NOT ESSENTIAL. To establish the crime of larceny, it is not essential that accused intended to benefit from the taking.

2. LARCENY—INTENT TO STEAL AT TIME OF THEFT IS ESSENTIAL ELEMENT—"FELONIOUS INTENT." Under Comp. Laws 1917, section 8285, defining larceny as the felonious stealing, taking, etc., the personal property of another, the felonious intent—that is, the intent to steal—must be shown to have been present at the time of the taking (citing Words and Phrases, First and Second Series, Felonious Intent; Larceny).[1]

3. LARCENY—EVIDENCE HELD NOT TO SHOW INTENT TO STEAL BY KILLING TRESPASSING HORSES. Evidence showing that defendant had repeatedly stated in public that he intended to kill horses allowed to run at large, which were trespassing upon and injuring his property, and that he did corral a herd of such horses, and, after turning loose those which had been branded, killed the others, is not sufficient to warrant an inference of intention to steal.

4. CRIMINAL LAW—JURY CANNOT DISBELIEVE DEFENDANT'S STATEMENTS AS TO INTENT MADE AT TIME OF ALLEGED CRIMINAL ACT. Though the jury can disbelieve statements of accused as to his intentions, and as a general rule the determination of intention is the exclusive province of the jury, they cannot disbelieve an intention declared at the time of the act with which all of the acts of accused were in harmony.

5. LARCENY—MERE INTENTION TO DEPRIVE ANOTHER OF HIS PROPERTY IS NOT SUFFICIENT. The intentional killing of horses belonging to another, thereby depriving the owner of his property, but without an intent to steal, does not constitute larceny, though

[1] *People* v. *Miller*, 4 Utah, 410, 11 Pac. 514; *State* v. *McKee*, 17 Utah, 370, 53 Pac. 733.

it might be malicious mischief, as defined by Comp. Laws 1917, section 8385 or 8388.

6. CRIMINAL LAW—SUPREME COURT CAN DETERMINE EFFECT OF UNDISPUTED EVIDENCE SUPPORTING ONLY ONE CONCLUSION. Where the evidence leaves no room for doubt that the intention of accused was to take the horses in order to destroy them, and no conflicting inference might legitimately be deduced therefrom, the Supreme Court can declare the effect of the evidence as a matter of law and reverse a conviction of larceny.

Appeal from District Court, Fourth District, Utah County; *A. B. Morgan*, Judge.

J. R. Allen was convicted of grand larceny, and he appeals.

REVERSED and REMANDED, with directions to dismiss the action and discharge the defendant.

*Marioneaux & Beck* and *M. E. Wilson*, all of Salt Lake City, for appellant.

*Dan B. Shields*, Atty. Gen., and *Jas. H. Wolfe, O. C. Dalby*, and *H. Van Dam, Jr.*, Asst. Attys. Gen., for the State.

FRICK, J.

The defendant was charged with the crime of grand larceny in the district court of Utah county, was convicted and sentenced to an indeterminate term, not exceeding ten years, in the Utah state prison, and in addition thereto to pay a fine of $1,000.00, from which he appeals.

The information is in the usual form. The material and controlling facts deducible from the statements of the witnesses who testified for the state and on behalf of the defendant, all of which facts are undisputed, are in substance as follows:

On November 27, 1918, and for five or six years prior thereto, the defendant and his brother were the owners of what in the record is called the Allen ranch, comprising approximate-

ly 20,000 acres of wild lands. The lands were unfenced and were used by the defendant for grazing lands for his sheep, numbering, including all ages and sexes, about 6,000 head. The lands were all arid, and the only water obtainable to water his sheep was from a spring which was owned by the defendant, the water of which, by means of a pipe line constructed by him, was conducted a long distance to the corrals on the ranch. At or near the corrals there had also been constructed a cement or concrete tank of the capacity of about 10,000 gallons, into which the water flowing from the pipe line was discharged. Near this tank and the corrals were also constructed cement or concrete watering troughs by means of which the sheep, old and young, were watered daily. Those watering troughs were supplied with iron railings to keep the sheep from crowding into them, but through or under such railings they could easily reach the water. There were also what are termed lambing grounds on the ranch at which tubs were kept to water the sheep having lambs. The ranch is in a somewhat extended valley in Utah county surrounded by hills and mountains and large tracts of wild government lands. The feed for the sheep on the ranch was at times somewhat scarce. There was a large band of horses, by some witnesses placed at about 100 head, which roamed at will over the wild lands aforesaid and over defendant's ranch. These horses made daily incursions upon the watering troughs aforesaid to obtain water, and in doing so would paw down and destroy the watering troughs, destroy the iron railings thereon, and upon occasions trample the sheep, and especially the lambs, and injure them, and prevent the sheep from obtaining water. These horses had torn down the tank that was first erected and which had to be replaced by a stronger one. They also ate the feed growing on the ranch which was needed for the sheep, and in many ways constantly harassed, annoyed, and interfered with the sheep and lambs on the ranch so that the horses became what in the record is termed an unbearable nuisance. The defendant's testimony in describing the actions of these horses is not only uncontradicted, but is in substance corroborated by some of the state's witnesses as well

as his own, and for that reason we insert his statements. He testified:

" * * .* When we are watering sheep here in the spring and in the fall, they come in, rush to these troughs. They would be all around the troughs here, eight to ten sheep deep, and still stringing in. These bands of horses, 100 or more of them, would come up to these troughs because the water from the spring is the only water they could get. The horses would come up in bands of twenty-five to thirty-five, they came in on the run, one behind the other, like a bunch of deer, up to the troughs for water; they would pile into the sheep, pawing the sheep, trampling the lambs and the sheep; then they would stand around the troughs and gradually they would work away to the edge of the valley again; they would break the cement on the side of the troughs and break the irons off the troughs, putting me to a constant expense to repair them; and these horses would eat the grass which I needed for the sheep; it was an injury to me to have them eating up the grass. This condition continued for nearly two years before the complaint in this case. * * * On one occasion, about two years ago, we built a section of a tank with concrete, and these horses came in here to water and getting around the tank and rubbing against it shook it all to pieces, so we had to take out the concrete and build it over again. I am not seeking to give you all the occasions when the horses would come in and do damage, but only to tell you the general character of the damage they did when they made these incursions upon my property, and this continued for about two years and was of daily occurrence. Some of the horses were wild, and some tame ones would get in the bunch."

The defendant, it seems, knew who owned some of the horses, but there were many whose owners he did not know. Indeed, there were some which he thought had no owners. He, through his employés, had made numerous attempts to learn who the owners of the trespassing horses were. He also attempted to have the poundkeeper take charge of them. Upon inquiry, however, he learned that there was no poundkeeper in the precinct. At one time, as the sheriff of the county, who was a witness for the state, testified, the defendant appealed to him for advice respecting the trespassing horses and what to do with them. After obtaining no satisfactory information or results from any source the defendant in the afternoon of the 27th day of November, 1918, with the assistance of two or three of his employés, rounded up a band of thirty or forty

trespassing horses which were on the ranch in the vicinity of the corrals and watering troughs and drove them into a corral. They drove the horses into the corral for the purpose of examining them to ascertain whether they were branded and in case a brand or mark was found on any horse it would be turned loose. In making the examination aforesaid six horses of various ages and sizes and two mules, one of which was quite young, were found which had no brands or marks, and the owners of which, if they had any, were unknown to the defendant. He then and there declared his purpose to "get rid" of the unbranded horses and mules which were not known to have any owner, and, in order to get them away from the watering troughs and corrals, he directed one of his employés to drive the six horses and the two mules to a ravine which was between two and three miles distant from the watering troughs and corrals, but only a short distance from a public road, where he said he would shoot and kill them. The employé then drove the six horses and two mules to the ravine, where the defendant shot and killed them with his rifle and permitted them to lie where they fell. The dead animals were in plain sight from the public road aforesaid. The defendant frequently stated what his purpose in killing the animals was. Upon that subject he testified:

"* * * Coming down to the very day in question here, I was on the ranch that day, and I saw these animals that had been doing damage. They were on the property belonging to me and my brother. I told my employés, Melvin Webb and Henry Nichols, to go out and corral them. I intended to get what horses there was in the bunch that had no brands nor any signs of ownership and kill them; that is what I made up my mind to do, and that is what I told Webb and Nichols. I gave it out publicly to all those that were about that I intended to kill those horses. I thought I had a right to kill them. People have been killing the same kind of horses in that valley and Rush Valley for years. * * * When I ordered these animals penned up and driven into the corral, I had no idea or thought of stealing them. I thought that I had a right to kill them because of the damage they were doing. * * * I thought of no other way in which I could prevent them doing damage; * * * examined them all carefully, and when I found any that had any brands on them I turned them out of the corral. I would work around and cut them out and shoot them out of the gate,

assisted by Mr. Webb, Mr. Nichols, and Mr. Foreman. I turned out this Carson team. * * * Anything that looked like it was owned or used, or looked like horses that any one had bred or used on the farm, we turned out. I did not kill any that I thought I might be able to find the owners of. I figured that they were horses that had not been owned, or their ancestors, for years. I honestly believed that none of them bore a brand. I could not find a brand on any of them to save my life, and my eyes are pretty good, I think."

Some months after the killing there were six individuals who claimed to be the owners of the six horses and two mules that had been killed as aforesaid, and they lodged the complaint against the defendant upon which he was tried and convicted.

There was much other evidence which, if this case were a proper one for a jury to consider, would be material; but, in view of the conclusion reached, all of such evidence is deemed immaterial, and no further reference will be made thereto.

Upon substantially the foregoing facts defendant's counsel moved the court to direct the jury to return a verdict of not guilty upon the ground that the evidence fails to establish the crime of larceny. The particulars in which the evidence was alleged to be insufficient were stated in the motion. In order to reflect what was in the mind of the district court, we here insert its language in concluding its statements in ruling upon the motion for a directed verdict. After stating that it was the exclusive province of the jury to determine the intent of the accused and that in directing a verdict the court would in that, and perhaps in some other, regard impinge upon that province, the court said:

"I don't see how we can escape the conclusion that as the law now stands in this state, if the defendant knowingly and willfully takes a horse or a mule that belongs to another and asports it, drives it away, reduces it to his possession with the intention to deprive the owner permanently of its use, that the jury may find him guilty of grand larceny. They may find him guilty according to all the facts and circumstances in the case, and I don't see how it is possible for a trial court as the law now stands to take any other view from this. So the motion for a directed verdict is denied."

We have carefully examined the whole record of the pro-

ceedings of the court at the trial, including the rulings of the court, and, so far as the record discloses, the court's rulings were fair and impartial. It also appears from the record that the court denied the motion for a directed verdict with hesitation, even with some reluctance, but, in view of what was said by this court in the case of *State* v. *McKee,* 17 Utah, 370, 53 Pac. 733, the court felt bound to overrule the motion. We shall refer to the decision in that case hereinafter.

Comp. Laws Utah 1917, section 8285, defines the crime of larceny in the following words:

"Larceny is the felonious stealing, taking, carrying, loading, or driving away the personal property of another."

Our statute also divides the crime of larceny into grand and petit larceny, depending upon the value of the property stolen. However, the stealing of certain animals of any value constitutes grand larceny. The court, therefore, in charging the jury, after copying the foregoing statute defining larceny, also charged them as follows:

"Grand larceny is committed in either of the following cases: 'When the property taken is a horse, mare, colt, gelding, cow, heifer, steer, ox, bull, calf, sheep, mule jack or jenny'—provided that the taking is with a felonious intention; that is with the intent to steal."

The definition of larceny as found in section 8285, supra, is taken from and is a verbatim copy of section 484 of the Penal Code of California. See 4 Kerr's Cyc. Codes of Cal.

Defendant most earnestly contends that the evidence is wholly insufficient to establish the crime of larceny as it is defined in the foregoing statute and in the charge of the court, while counsel for the state, with equal earnestness, insist that the evidence is sufficient to establish every essential element constituting that crime. Much is said in the briefs of both the attorneys for the defendant and counsel for the state concerning what in the decisions and text-books is denominated lucri causa or the intent of the defendant to benefit himself or some third person by stealing the property in question. See 2 Bishop, New Crim. Law, section 846, subd. 3, pages 493, 494, where the subject is discussed. Defendant's attorneys, in their principal brief, with much vigor contended that in

order to constitute the crime of larceny it is necessary to prove that the accused intended to derive some benefit either to himself or for some other person from the theft; in other words, that lucri causa must be shown. Counsel for the state in their brief with equal vigor combat that contention and insist that in this state it is not necessary to prove lucri causa or that the accused intended to derive any benefit either for himself or otherwise, from the taking. Defendant's attorneys in their reply brief, however, receded from the position taken in their principal brief in that regard, and hence we are relieved from the necessity of considering the question at length. It is only necessary to state here that in this jurisdiction the law is settled that it is not necessary to establish lucri causa; that is, to show that the accused intended to derive any benefit either for himself or for some other from the theft. In the course of this opinion we shall, however, cite some cases in which the question is discussed.

Defendant's attorneys, however, further insist that under a statute like ours, in order to establish the crime of grand larceny, it must be proved beyond a reasonable doubt that the accused took the property with a felonious intent—that is, with the intent to steal—and it must appear that such intent existed in the mind of the accused at the time of the taking. They further insist that in this case there is not only no evidence from which such an intent may be deduced or found, but that the uncontradicted evidence clearly shows that there was no such intention in the mind of the defendant. While the position of counsel for the state with respect to the foregoing proposition is not outlined in their brief as clearly as it might be, yet, if we understand their argument, it is this: That, while it may be necessary to show that the taking was felonious, yet the term "felonious" is merely descriptive of or characterizes the crime, and that the evidence in this case is ample to show that what the defendant did with respect to the horses was with a felonious intent. As we understand the term felonious intent as it is applied to the crime of grand larceny, it means that the accused took the property with a

felonious intent, that is, with the intent to steal it. That is precisely what the court charged the jury and such has been declared to be the law of this state. In *People* v. *Miller*, 4 Utah, 410, 11 Pac. 514, it is held that, in order to convict of larceny, the taking must be with a felonious intent, and that the intent to steal must exist at the time the property is taken.

The Supreme Court of California, from which state, as we have seen, our statute is copied, has repeatedly so held. In *People* v. *Devine*, 95 Cal. 227, 30 Pac. 378, the court adopts and quotes the language of the New York Court of Appeals from the decision in *McCourt* v. *People*, 64 N. Y. 583, as follows:

"Every taking by one person of the personal property of another, without his consent, is not larceny, and this although it was taken without right or claim of right, and for the purpose of appropriating it to the use of the taker. Superadded to this there must have been a felonious intent, for without it there was no crime."

The court also quotes from the case of *People* v. *Cheong Foon Ark*, 61 Cal. 527:

"One person may take or carry away the property of another, of the value of over fifty dollars without being guilty of any offense whatever. But, if he does the act feloniously; the statutory crime is committed."

The court also refers to the case of *State* v. *Homes*, 17 Mo. 369, 57 Am. Dec. 269, where it is said:

"To constitute the offense of larceny, it is absolutely necessary that the taking of the goods be with a felonious intent."

A very large number of cases are cited by the annotator in the notes to that case (57 Am. Dec.) in support of the text.

In *State* v. *Rechnitz*, 20 Mont. 488, 52 Pac. 264, the Supreme Court of Montana held that, although the statute of that state, in defining the crime of grand larceny, did not require the taking to be with a felonious intent, nevertheless, in order to convict of larceny, it was necessary to prove that the taking was with a felonious intent—that is, with an intent to steal. That case is followed in *State* v. *Sloan*, 35 Mont. 367, 89 Pac. 829. In *Williams* v. *State*, 22 Tex. App. 332, it is held that the accused is not guilty of larceny unless he took the property with the intent to steal it. *State* v. *Gazell*, 30 Mo.

92, is to the same effect. In 17 R. C. L. page 19, section 21, it is said: "A felonious taking is an essential element in larceny." For further cases we refer the reader to 5 Words and Phrases, First Series, pages 3993 to 3997, inclusive, where numerous cases are referred to in which the same doctrine is held. See, also, to the same effect, 3 Words and Phrases, Second Series, pages 16-18.

We therefore are constrained to hold that, in order to convict of grand larceny under our statute, it must be proved beyond a reasonable doubt that the taking was with a felonious intent—that is, with the intent to steal the property in question—and that such intent must have existed at the time of the taking.

There is nothing to the contrary in the case of *State* v. *McKee*, suprá, upon which case the ruling of the district court in this case is based. In view that that case is specially relied on by the state to sustain the conviction in this case, we here quote all that is said in that case which has any relevancy to the case at bar:

"Defendant insists, further, that there was no proof that the defendant drove the sheep away from the place where they were kept by their owners, and that they were converted to the use of the defendant; that there was no evidence of asportation and conversion. There was evidence that the sheep were in the possession of the employés of their owners and that the employés were blindfolded by the defendant and three other men, and tied to trees, and that the four men took and drove the sheep away, and killed a large number of them, and wounded many more, and never returned any of them. It was not necessary to prove that the defendant and the others with him actually intended to convert the sheep to their own use. It was sufficient to prove beyond a reasonable doubt that they took the sheep away, against the will of their owners, with the intention of permanently depriving them of their property; and the fact that they killed a large per cent. of them, wounded others, and never returned the rest, was sufficient proof of such an intention."

A mere casual reading of the foregoing excerpt shows that the writer of that opinion undertook to answer the objections of the defendant, which are: (1) That there was no proof that the defendant drove the sheep there in question away from the place where they were kept; (2) that it was not proved

that the sheep were converted to defendant's use; and (3) that there was no evidence of asportation. The writer of the opinion, then, answered these three propositions and shows that the sheep were actually driven away and the manner of their taking, that there was sufficient asportation, and that it was not necessary to prove lucri causa or that the defendant intended to derive any benefit from the taking of the sheep. That is all that is decided and all that could have been decided in view of defendant's objections, which were stated as outlined above. The writer of the opinion did not undertake to state the elements which constitute the crime of grand larceny under our statute. Nor is there anything said in that opinion which could be construed to mean that either the writer of the opinion or the court intended to modify, much less overrule, the rule laid down in the case of *People* v. *Miller,* supra, to which we have referred. The McKee Case is clearly distinguishable from the case at bar.

The question therefore remains: Is there any substantial evidence from which the jury could find that the defendant took the horses with a felonious intent—that is, with the intent to steal them or any of them? We have read this record over carefully and have much reflected upon it, and we confess our inability to discover any evidence whatever from which in any view of the law reasonable men would be justified in finding that the defendant corraled the horses in question, that he drove them into the ravine, and that he killed them with a felonious intent or with the intent to steal them or any of them. If there were nothing in this case except the naked fact that the defendant corraled the horses, that he drove them to the ravine and killed them there, even then, in view of the conditions under which they were corraled and driven away and killed, it would be doubtful whether the evidence would justify a finding that the horses were killed with a felonious intent to steal them. But we are not left in doubt respecting the purpose and motive of the defendant in corraling the horses and in killing them. It seems very clear to us that the defendant did not only not intend to steal the horses, but that that intention never could have

entered his mind.   He openly and repeatedly declared his pur-
pose and intention in corraling and in shooting the horses,
and his acts and conduct were in strict harmony with such ex-
pressed purpose and intention.   Is it permissible for a jury to
completely reverse the expressed intention and purpose of one
accused of crime where the acts and conduct of the accused
are in strict harmony with and clearly effectuate the expressed
purpose and intent?

It is quite true that a jury is not bound to believe what the
accused may say concerning his motives, his purpose, or his
intentions, and that, as a general rule at least, it is the ex-
clusive province of the jury to determine the intention with
which an act was done.   When, however, as here, the accused
has openly, repeatedly, and explicitly declared his purpose
and intention respecting the act in question, and his declara-
tions are not only not in conflict with the manner in which the
act was done, but are in strict harmony and conformity there-
with, may a jury say that his intention and purpose are not
what his declarations and acts indicate them to have been?
While it is true that the jury is not bound by the statements
of the witnesses respecting the purpose and intentions of the
accused and that they may find that the real purpose and in-
tention of the accused were not as stated, yet there is a limit
beyond which a jury may not go.   To illustrate:  Assuming
that the question were material whether the accused pursued
a particular course or direction and he and his wit-
nesses testified that he took a course due north from
one point to another, the jury would, nevertheless, be
justified in finding that the accused deviated from a due
northerly course, and, if the circumstances justified it, they
could find that there was in fact a considerable deviation
from a due northerly course.   The jury would, however, not
be justified in finding, without any evidence to support it, that
the accused went either due east or due west, much less that
he traveled due south or precisely in the opposite direction.
A judgment based upon such finding would be contrary to
both law and fact.   That, in effect, is what the jury did in
this case, however.

Upon what theory, therefore, does the state seek to justify

defendant's conviction? As we understand the state's coun-
sel, it is simply this: That the acts of the defendant are not
in dispute, that he intended to kill—that is, to destroy—the
horses, and in doing so manifestly intended to permanently
deprive the owner or owners thereof of their property, and
that his acts in destroying the horses were unlawful and
wrongful, and hence the jury had the right to find that what
he did in killing the horses was with the felonious intent to
steal them. It will thus be seen that counsel for the state not
only seek to transmute what may be termed an unlawful and
wrongful act into a felonious one, but they seek to transmute
the act into grand larceny; that is, they insist that what was
done by the defendant with respect to the killing of the horses
was with intent to steal them. As is clearly pointed out by
the author in 2 Bishop's New Criminal Law, section 846, subd.
3, malicious mischief resulting in the destruction of property,
although done with the intention of permanently depriving
the owner of the property, cannot be transmuted into the
crime of larceny. It no doubt was for that reason that the
Legislature of this state adopted the statute defining malicious
mischief.

Comp. Laws Utah 1917, section 8385, reads:

"Every person who maliciously injures or destroys any real or
personal property not his own, in cases otherwise than such as are
specified in this Code, is guilty of a misdemeanor."

The only other section material here is section 8388, which
provides:

"Every person who maliciously kills, maims, or wounds an animal,
the property of another, or who maliciously and cruelly beats, tor-
tures, or injures any animal, whether belonging to himself or an-
other, is guilty of a misdemeanor."

It is manifest, therefore, that the mere fact that property is
destroyed maliciously and with the intent to deprive the
owner permanently of its use does not constitute larceny. In
order to constitute that crime, the animals must have been
taken with a felonious intent—that is, with the intent to steal
them. Our statute (Comp. Laws Utah, section 7908) requires
that in order to convict of a felony there must exist at the
time the crime is committed "a union or joint operation of

act and intent''; that is, there must exist in the mind of the accused the intent to do the prohibited act with which he is charged. For example: He may not be convicted of larceny by showing that he intended to violate the law in some other particular, but it must appear that he intended to violate the statute defining larceny. In this case, therefore, it is not enough that the defendant intended to deprive their owners of the horses by intentionally killing them, but it must be shown that at the time he took the horses he did so with intent to steal them. Unless that is shown, there is not the necessary union of the act of taking and the mental intent to steal.

While counsel on both sides conceded at the hearing that they were unable to find a case in which the facts were precisely parallel with the facts in the case at bar, they nevertheless found some cases which are more or less analogous and in which the principles which, in our judgment, must control this case are stated. The case of *Pence* v. *State*, 110 Ind. 95, 10 N. E. 919, is such a case. Indeed, the facts in that case are much stronger against the accused because he took the property from the owner's possession, and not, as here, when the horses were actually trespassing on the premises of the accused. The defendant in that case was charged with the crime of grand larceny. The evidence was to the effect that he had some grudge against the owner of the property, a buggy in that case, and to ''get even'' with the latter the defendant took the owner's buggy from the shed where it was being kept by the owner and ran it off some distance, poured coal oil over it, and set it afire and burned it so that it was worthless. In that case, as in this, the defendant had stated to others that he would take and burn the buggy and that he intended to do so. In the course of the opinion it is said:

"Each one of the state's witnesses, the substance of whose evidence we have given, and especially the prosecuting witness, Snyder, has testified explicitly to the express and specific intent of appellant in taking, removing, and burning Snyder's buggy; and that intent was to get even with Snyder for a real or imaginary wrong, not by the stealing, but by the malicious injury or destruction of Snyder's buggy. In such a case, and upon such evidence, there is

no possible room for the inference even, by court or jury, of the necessary felonious intent on the part of appellant, or of any other or different intent on his part than the one shown by such evidence. It follows, therefore, that the verdict of the jury in this cause was not sustained by any sufficient evidence, and, of course, was contrary to law; and for these causes appellant's motion for a new trial was well taken, and ought to have been granted."

That case is approved in *Robinson* v. *State*, 113 Ind. 510, 16 N. E. 184, where it is said:

"If it appears that property has been taken and carried away as an incident merely of the commission of some other substantive offense, such taking may not constitute larceny, even though by the commission of the principal offense the owner has been deprived of his property."

See, also, *People* v. *Murphy*, 47 Cal. 103.

What happened in the case at bar is this: The defendant corraled the horses, not for the purpose of stealing them, but for the purpose of culling out those without any brand or mark of identification or ownership and with the intention of killing those without such a brand or mark. The taking was therefore for the purpose of killing the horses, and not for the purpose of stealing them. The purpose for which the horses were corraled and driven was undoubtedly an unlawful purpose, and may have constituted the crime of malicious mischief, a question not before us and not decided. That, as clearly appears from the decisions quoted, does not constitute the crime of larceny. While no doubt the patience and forbearance of the defendant were sorely tried, yet that did not justify him in killing the horses. Such acts find no excuse or justification in law. While not justified, and while such acts are reprehensible, they do not constitute the crime of larceny. To so construe them and to convict the defendant of a felony, would constitute an infinitely greater wrong against him than the wrong he has committed against society if considered in its worst light. While the wrong he has committed may be redressed, the wrong against him, if this conviction were to be permitted to stand, never could be redressed.

The evidence in this case leaves no room for dispute, or doubt even, that the only purpose and intention of the defendant was to take the horses in order to destroy them. That

being so, the jury could not legally find him guilty of larceny, and this court not only has the power, but it is its duty, to set aside the verdict and judgment based thereon. This defendant is entitled to the protection of the law precisely the same as any other person accused of an offense.

In *Akins* v. *State,* 12 Okl. Cr. 269, 154 Pac. 1007, the Criminal Court of Appeals of Oklahoma, in a case where the evidence, as in this case, without conflict showed that the intention to steal was lacking, in the course of the opinion said:

"In cases of theft the question of the intent with which the accused took the property is one of fact, to be decided by the jury, except where the taking is open and without fraud or stealth, under a claim of ownership, or where, as in this case, the testimony as to the taking, standing alone, raises a presumption of fact in favor of an innocent taking, and, there being no evidence from which the jury may legitimately infer a felonious intent, such evidence is insufficient to sustain a verdict of guilty."

Where there is no conflict, and no conflicting inferences may legitimately be deduced from the evidence, it is the duty of this court to declare the effect of the evidence as a matter of law.

Counsel for the state have referred us to the following cases, among others, which they insist sustain their contention, namely: *Hamilton* v. *State of Mississippi,* 35 Miss. 214; *Warden* v. *State,* 60 Miss. 638; *State* v. *Gilbert,* 68 Vt. 188, 34 Atl. 697; *Lundy* v. *State,* 60 Ga. 143; and *State* v. *Gray,* 106 N. C. 734, 11 S. E. 422. The cases cited from Mississippi are very unsatisfactory. The reader cannot tell from the decisions whether the court does or does not hold that it is necessary to prove a felonious intent—that is, an intent to steal—in order to constitute larceny. In the other three cases no attempt is made to state the elements constituting larceny. All that is directly decided in them is that it is not necessary to prove that the property was taken by the accused with the intention to benefit himself or another and that the asportation in those cases was sufficient. A number of cases are also cited by counsel respecting the meaning of the terms felonious and felonious intent. It is not necessary to consider that question further than we have done. All that need be said is that it would be utterly impossible to reconcile, much less to follow, the

many loose expressions of the courts concerning the meaning of those words. At all events we shall not attempt it here.

After carefully reading and considering the record in this case, and after applying the law as we understand it to the undisputed facts, we are forced to the conclusion that the verdict finds no support in the evidence, and hence the judgment cannot stand. We are also of the opinion that it is not possible for the state to make out a case of grand larceny against the defendant, and therefore the judgment is reversed, with directions to the district court of Utah county to dismiss the action and to discharge the defendant.

CORFMAN, C. J., and WEBER, GIDEON, and THURMAN, JJ., concur.