## STATE v. DIAZ

4985.   Decided August 16, 1930.   (290 P. 727.)

*James S. Gregerson,* of Salt Lake City, for appellant.

*L. A. Miner,* Asst. Atty. Gen., and *Geo. P. Parker,* Atty. Gen., for the State.

FOLLAND, J. Defendant was convicted of murder in the first degree and sentenced to death. He appeals. Only two questions are presented on this appeal: First, it is contended that the defendant's motion for new trial should have been granted upon the alleged ground that the verdict is contrary to the evidence and the court's instructions

with respect to the question of premeditation and intent. Second, that the court erred in overruling defendant's objection to the testimony in rebuttal of the state's medical expert, and particularly in permitting him to answer the hypothetical question propounded by the state.

Juan F. Martinez, a Mexican section hand in the employ of the Oregon Short Line Railroad Company, was found dead, lying upon a cot in his room in a bunkhouse near Kaysville, Davis County, Utah, about 5 o'clock p. m., May 10, 1929. The body was discovered by other section workers upon their return from work. The deceased met his death as the result of a bullet wound in the top of his head. The physcian who examined the body gave it as his opinion that death, which had been instantaneous, had occurred at about 10 o'clock in the morning, that the body had not been moved after life had passed, and that the wound could not have been self-inflicted. The deceased had been working night shift, and was last seen alive about 8 o'clock in the morning of May 10th as he left his work and was traveling toward the bunkhouse. His companions who slept in the bunkhouse with him were working day shift. These men, upon returning from work about 5 o'clock found the outside door padlocked. They entered the house and found the body of Martinez lying upon a cot. There was nothing to indicate that the deceased had been engaged in any struggle immediately prior to being shot. He was lying upon his back, with his head turned to one side and the right hand elevated a little and bent over his body. He had on his pants and shirt, but shoes and socks had been removed. His face was partially covered by part of an old sweater. One pocket of his trousers had been turned inside out. There was a .22 caliber rifle leaning against the table in the kitchen. The rifle had an empty cartridge in the barrel and several loaded shells in the magazine.

Three other Mexicans lived in the section bunkhouse in which were two or more small bedrooms and a kitchen. Certain articles of clothing, shoes, mackinaw coat, and a suit-

case belonging to one of these men, Zavalo, were found to be missing. Zavalo's trunk had ben broken open, apparently by means of an ax which was lying by the side of the trunk. The tray was by the side of the trunk, and some articles of clothing had been scattered around. A pair of pants afterwards found upon the defendant had been taken from the trunk. The deceased had received two pay checks, Nos. 5554 and 5782, which were made out in the name of John Martinez. At about 10:45 a. m. of May 10th, the day of the homicide, the lawn tender of the Oregon Short Line Railroad Company observed a Mexican wearing a blue serge coat and pants and light cap, and carrying a suitcase in one hand and a large bundle in the other, walking northerly on the Oregon Short Line Railroad Company platform at Kaysville; that is, he was walking away from the direction in which the bunkhouse was located. At about 11:38 a. m. a Mexican wearing a blue coat, carrying a suitcase, went to the ticket window of the Bamberger Electric Railway Company at Kaysville and asked for a ticket to Salt Lake. Upon being told by the agent, "There is no train until twelve o'clock, it is a bus," he said, "Give me a ticket to Ogden." The agent sold him an Ogden ticket and the Ogden train was just then coming into the station. This man was sweating; sweat rolled down his face, and he had a strong odor about him; he seemed agitated and excited. The evidence shows that this defendant was in Ogden between 12 and 1 o'clock on that date; that he went to a clothing store operated by Max Oliash, where he bought a cap which was offered and received in evidence as Exhibit G, and in payment he tendered the Oregon Line pay check No. 5782 which was made payable to John Martinez. The check had already been indorsed, so the proprietor of the store required the defendant to sign his name on a card. The defendant told him his name was John Martinez, and he signed that name on the card given to him. At about the same time the defendant went into the clothing store operated by Glish Medoway in Ogden, where he purchased a pair of pants, a sweater, which was received in

evidence as Exhibit H, and a shirt. In payment for these he tendered Oregon Short Line pay check No. 5554. This proprietor also had him sign a card for the purpose of identifying the signature on the check, which was already indorsed, and again he signed the name John Martinez. In each case he received money for the balance of the check. Each of these clothing merchants identified the defendant as the person who presented the checks and bought the articles, and said that at the time of the transaction defendant was not nervous, or groggy, or sick, that he acted in a normal manner. The manager of the Panama Hotel testified that a Mexican boy registered at her hotel between 11 and 12 o'clock on May 10th, and that he left the hotel about 8:30 p. m. and did not come back; that this man gave no indication of being drunk or under the influence of narcotics. At the time he left, he was wearing the cap and sweater which were identified as Exhibits G and H, respectively.

The defendant was apprehended in South San Francisco. A deputy sheriff of Davis county went to California for the purpose of bringing defendant back to Utah. The deputy sheriff testified that he saw the cap, Exhibit G, on the defendant in the county jail at South San Francisco, and also the sweater, Exhibit H, and that the trousers worn by him in the jail in California were the trousers identified as Exhibit B which were taken from the trunk in the bunkhouse, and that when the defendant left with the sheriff, the defendant brought with him the mackinaw coat which was identified as Exhibit A, and which belonged to the witness Zavalò. Several conversations were had with the defendant by the officers and were testified to by them. These conversations, which were received in the nature of admissions, were shown to have been voluntarily made. There is no error assigned by the defendant with respect to the admission of this evidence. In one of these conversations the defendant stated that he had cashed the checks at the places and in substantially the manner testified to by the merchants, and, when asked by the officer where he got the

checks, he answered: "He said he got them off Juan—that is the way he said it, and that is as far as I went into details with him there."

The defendant further stated to the officers that he had taken the suitcase belonging to Zavalo. When asked how he came to kill the deceased, he said, according to one of the witnesses: "That the deceased had been sitting on the bed and that they had got into a quarrel and the deceased jumped up and grabbed the knife; that the defendant had taken the knife away from him and thrown it away; that the deceased then took the gun or 22 calibre rifle and he grabbed it from him, and then they wrestled, and the defendant got his hand onto the trigger of the gun and as they wrestled the gun went off and killed Martinez," and in answer to inquiry as to why he had done it, he said, "I had been drinking considerably."

The defendant went upon the stand and testified substantially as follows: that he was past 20 years of age, had been in the United States since 1924; that he had been working on the section and living in the same bunk house with Martinez; that on the 6th of May he, through Martinez, asked the foreman for his time and quit work, going to Salt Lake; that on the night of the 9th he returned to Kaysville and saw the deceased and the other Mexicans who lived at the bunk house and there visited with them; that he had a bottle of whisky which he passed around and that all drank together. Thus far his story is corroborated by other witnesses. The defendant said he then left Kaysville and came back to Salt Lake and that he drank considerable with some Mexican boys there. He was unable to give their names or where he met them or where he drank with them. He stated they drank all night and that toward morning he bought some cigarettes and that some one gave him marijuana which he smoked. He did not remember returning to Kaysville the the next day nor anything else which happened until he was on the train on his way from Los Angeles to San Francisco, having first gone from Salt Lake to Los Angeles. He claimed

his mind was an entire blank as to all that happened to him and stated that after smoking the marijuana he became "very crazy."

Two points are raised on this appeal. The first one urged by the appellant is that the court erred in denying defendant's motion for a new trial for the reason that "the verdict of the jury is against the weight of the evidence and against the instructions of the court." · The only defense interposed at the trial was that at the time of the homicide the defendant was under the influence of intoxicating liquor and marijuana so that his mind "was in such a state as to preclude the existence of any purpose, motive or intent to commit the crime of which he was convicted." The defendant's testimony, as already indicated, was that he had been drinking whiskey on the night of the 9th and morning of the 10th; that he bought cigarettes and was given marijuana and that after he smoked the cigarettes and the marijuana that he was "very crazy." He did not know who the boys were with whom he drank except such drinking as he did at Kaysville when he and four or five others had a small flask of whiskey between them. There is nothing definite in his testimony as to the amount of liquor he drank nor the amount of marijuana he smoked. He said he did not remember returning to Kaysville on the 10th nor of seeing Martinez on that morning; did not remember shooting Martinez; did not remember cashing of checks or going to Ogden or anything else that happened on the day of the 10th. It is contended that this evidence shows concusively that the defendant's mind was in such a state or condition as to preclude the existence of any particular motive or intent to commit murder in the first degree; that it would preclude the element of premeditation and thus require a verdict, if a verdict of guilty at all, in some degree less than murder in the first degree. A physician, called by the defendant testified as to the effect of the use of marijuana. He stated that it is narcotic and acts upon the central nervous system affecting the brain, producing exhilarating effects and causing one to do

things which he otherwise would not do and especially induces acts of violence; that violence is one of the symptoms of an excessive use of marijuana; that one who had used considerable liquor and also marijuana would have an aggravated condition as a result of the marijuana and that the effects of such use might last several days; that the mental condition would be very much aggravated if the individual had been using intoxicating liquor and thereafter had smoked a considerable amount of marijuana and would not be altogether accountable for what he did. That the marijuana produces an "I don't care" effect. A man having used liquor and marijuana might deliberately plan a robbery and killing and carry it out and escape, and then later fail to remember anything that had occurred. He might remember that he had committed a crime but probably would not know what crime. He might remember some of the incidents, but not all of them.

The court gave instructions which fairly presented to the jury the issues raised by the defense, among others, the following:

"No. 8. You are instructed that under the law no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition; but whenever the actual existence of any particular purpose, motive or intent is a necessary element to commit any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive or intent with which he committed the act.

"That is to say, if you believe from the evidence that the defendant was intoxicated, either as a result of drinking intoxicating liquor or smoking marijuana, at the time of the commission of the alleged crime, if you find from the evidence that he did commit it, to such an extent that he was mentally incapable of deliberating or premeditating or entertaining malice aforethought, or to form a specific intent to take the life of the deceased, in such event the jury should find him not guilty of murder in the first degree.

"And you are further instructed that wherever as explained in these instructions any particular purpose, motive or intent is a necessary element to commit any particular species or degree of crime, you may take into consideration the fact that the accused was in-

toxicated at the time, if you believe he was intoxicated, in determining the purpose, motive or intent with which he committed the crime, if you believe from the evidence that he did commit it.

"However, if you believe from the evidence that the defendant's intoxication, or abnormal condition, if any, did not affect the mind of the accused to the extent herein stated, or at all, then it is your duty to disregard the matter of intoxication and not consider it."

"No. 10. After you have considered the case submitted to you, if you find from the evidence and according to the law given to you by the court that you are not convinced beyond a reasonable doubt that the defendant has committed the crime charged in the information, or any crime included within it, then you should acquit him; but if you find from the evidence beyond a reasonable doubt that any such crime has been committed by the defendant, without any justification therefor, you should next inquire as to the degree of the offense and determine such degree, and if you are convinced by the evidence beyond a reasonable doubt that the defendant has committed one of the crimes included within the information in this case, without any justification therefor, and there is in your mind a reasonable doubt as to which of said crimes or degrees he is guilty, you can only find him guilty of the lowest of such crimes or degrees, and if there is any reasonable doubt in your mind on the whole case as to whether the defendant is guilty of any crime charged in the information, you must find him not guilty.

"If there is any reasonable doubt as to premeditation, there can be no conviction of murder in the first degree. If there is a reasonable doubt as to whether the killing was with malice, there can be no verdict of murder in the second degree. If there is a reasonable doubt as to whether the elements which compose the crime of manslaughter have been proved, the defendant cannot be convicted of that offense. If there is any reasonable doubt on the whole case, the defendant must be found not guilty."

No objection was made or exception taken to these instructions. On the other hand, the defendant relies upon them as being an accurate statement of the law applicable to the case. The argument made by counsel for the defendant is, however, that the jury disregarded these instructions of the court and the evidence of the defendant and of the medical men. He says:

"In the case at bar it is apparent that the appellant in this case was not only under the influence of intoxicating liquor, but that he

was also under the influence of marijuana, and the jury in finding the appellant guilty of first degree murder, under the facts as shown by the records in this case, clearly show that such verdict is against the weight of the evidence and against the instructions of the court. The law being that the appellant is only required to show his lack of capacity to form an intent and to know right from wrong and to prove such facts, not beyond a reasonable doubt nor either by preponderance of the evidence, but only so far as to create a reasonable doubt in the minds of the jurors, whether the homicide in question was excusable or not."

This argument, however, entirely fails to taken into consideration the fact that it is the duty of the jury to consider all of the evidence in the case and not rest its verdict merely upon the testimony of the defendant. The jury had the right to disbelieve the testimony of the defendant as to the extent of intoxication or incapacity produced by drinking and smoking. There is nothing definite in his testimony as to the amount of liquor consumed by him or the amount of marijuana smoked by him. The only corroboration of his testimony with respect to drinking is that of the witnesses who drank with him at Kaysville, when a small flask of whisky was consumed by five or six persons prior to 10 o'clock on the night of the 9th. It is entirely uncertain how much marijuana was smoked. The defendant in one place stated that a cigarette of marijuana was given him by the dealer who sold him the package of cigarettes, and that he smoked this. In another place in his testimony he stated that marijuana was given him by the boys with whom he was drinking. He indicates in his testimony a failure to remember anything more definite than this. The testimony of the medical experts is likewise indefinite, because they could not be informed as to the amount of liquor consumed or the amount of marijuana smoked. In their testimony it is clear that they based their conclusions upon the hypothesis that a "considerable amount" had thus been used. The jury is not bound to believe all that the defendant testified to. It is not required to blindly accept his testimony as the truth, especially where, as here, the other evidence in the case as to

the circumstances attending the commission of the crime and the conduct of the defendant immediately thereafter render his story improbable or doubtful. *State* v. *Allen,* 56 Utah 37, 189 P. 84. The jury had the right to disbelieve the testimony of the defendant that he had been drinking whisky and smoking marijuana to such an extent that he did not know what he was doing on May 10th. *State* v. *Hitesman,* 58 Utah 262, 198 P. 769. It was the duty of the jury under the instructions given by the court to determine from the evidence whether the defendant was in fact so intoxicated by liquor or his faculties benumbed by the use of marijuana that he was incapable of forming or in fact had no premeditated motive or design to kill the deceased. *Thomas* v. *State,* 18 Okl. Cr. 648, 197 P. 853; Wharton on Homicide (3d Ed.) 809. The credibility of the witnesses and the weight and value to be given to their testimony are questions exclusively for the jury. The jury had before it ample evidence from which it could find as it did that the defendant was capable of forming a premeditated intent to kill as defined in the instructions. There was the mute evidence of the homicide and the conditions attendant upon its commission, the testimony of the witnesses who saw him and transacted business with him a short time after the homicide, finding him then in an apparently normal condition, and also the explanations and admissions made by him as to the taking of the checks of the deceased and the manner in which the killing occurred as described to the officers after his arrest.

The second and third assignments are based upon the overruling of defendant's objection to the testimony of the medical expert called by the state and his answer to a hypothetical question propounded by the district attorney, and are based upon the ground that this expert had previously stated that, although he was familiar with the effect of narcotics upon the human system, he had had no experience with the use of marijuana. The question asked by the district attorney, to which objection was made, is as follows:

"Assuming that an individual about twenty-one years of age was in Kaysville about ten o'clock p. m. on the 9th day of May, 1929, and about between nine and ten a. m. on the 10th day of May an individual was shot while lying on a bed in a bunkhouse in Kaysville, with no indications of a struggle; the place was ransacked and the clothing stolen and two checks were stolen from the body of the person killed, and the person committing the murder or the crime packed up the clothing and put part of it in a suitcase and part in a bundle and carried a coat away and went to the station, the Bamberger station, in Kaysville, and asked the ticket agent for a ticket to Salt Lake, or he asked when a train went to Salt Lake and he was told in about half an hour, and then he wanted a ticket to Ogden and said 'Give me a ticket to Ogden' and purchased a ticket to Ogden and he went on the train to Ogden and there went to a rooming house and left the suitcase there and went to a place of business and cashed one of the checks, representing himself to be the individual designated as payee in the check, that is, the deceased person; upon request signing his name on a card and tendering the check in payment for a cap which he had selected, taking the change for the amount of the check above the amount of the purchase, and going to another store and asking for and buying a certain amount of clothing and buying two shirts, a pair of pants and a sweater, and tendering the other check in payment and receiving the change on the check; going to a rooming house and putting on other clothes and some of the clothes purchased; bought a ticket and came to Salt Lake, and there bought a bus ticket to Los Angeles, and from Los Angeles to San Francisco; in your opinion, doctor, could a person under the influence of narcotic drugs, carry out a course of conduct such as I have outlined?"

The answer to this question was "Yes."

Defendant's expert had been asked a hypothetical question of substantially the same character and the answer given by him was "Yes." Even if it were conceded, which we do not concede, that it was improper to ask the state's witness this question because of his unfamiliarity with the use of marijuana, there clearly was no prejudice to the defendant, since the answer was favorable to his contention and entirely in harmony with the answer given by the expert produced by him. This testimony was relied on to support the argument of defendant's counsel on the other branch of the case.

No other questions are presented to us for review on this appeal. We have carefully scrutinized the record to determine whether or not any error appears therein which has not been called to our attention by defendant's counsel. We have found none. A reading of the record convinces us that the defendant had a fair trial and that the issues presented by him in his defense were fairly and adequately presented to the jury; that there is ample evidence to support the jury's verdict, and therefore there is nothing we can do but affirm the judgment.

The judgment is affirmed, and the cause is remanded to the district court of Davis county, with instructions to fix the date of execution.

CHERRY, C. J. and ELIAS HANSEN, STRAUP, and EPHRAIM HANSON, JJ., concur.