STATE of Utah, Plaintiff and
Respondent,

v.

Walter J. WOOD, Defendant
and Appellant.

No. 16486.

Supreme Court of Utah.

May 13, 1982.

Richard B. MacDougall, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

The defendant, Walter J. Wood, was convicted of first degree murder for a murder committed in the course of a robbery and sentenced to death pursuant to Utah Code

Ann., 1953, § 76–5–202(1)(d).[1] On this appeal numerous contentions of error are asserted in both the guilt phase and the penalty phase of his bifurcated trial. On September 21, 1981, in a per curiam opinion and order, this Court sustained the conviction, vacated the death sentence, and remanded to the district court to resentence the defendant to life imprisonment as required by § 76–3–207(3). This opinion explains the Court's reasons for having affirmed the conviction and having set aside the death penalty.

Initially, both the defendant Wood and one Joseph J. Johann were charged with first degree murder for the killing of David Aasved during the commission of a robbery, a capital offense under Utah law. As a consequence of a plea bargain, Johann pleaded guilty to robbery of Aasved, agreed to testify against Wood, and received immunity from prosecution for Aasved's murder.

Both Wood and Johann testified at trial, each placing the responsibility for the killing on the other. Johann's testimony, corroborated in the most essential respects by Wood's confession, was as follows: Shortly after midnight on June 10, 1978, Johann and Wood were traveling in a rented automobile from California via Wendover, Utah, to Salt Lake City on Interstate Highway 80. Johann was driving. They stopped to pick up Aasved who was carrying a container of gasoline back to his van, some seven miles farther east, where he had left his wife and children. Aasved sat in the rear of the automobile, and Wood sat in the passenger seat in front with Johann. During the ride, Aasved volunteered the payment of $7 in single bills, and the cash was taken by Johann. As they drew near Aasved's van, Wood, who apparently had been dozing and "was half asleep and half awake," abruptly turned around and, without speaking a word, shot Aasved four or five times in the chest. Johann continued driving past the van and drove off the Interstate at Knolls, Utah. He and Wood dragged Aasved's body off the side of the frontage road and left it. Johann and Wood then continued east on the freeway.

At Teddy Bears, a truck stop on I–80, they left the freeway and, according to Johann, Wood drove away alone and was gone about one hour. There is no testimony as to what Wood did during that time.

After the shooting and the stop at Teddy Bears, Johann and Wood proceeded on to Salt Lake City with Johann at the wheel. There they utilized Aasved's credit cards to obtain lodging, rent another automobile, and purchase binoculars, among other things. On June 12, 1978, Wood and Johann drove to Coos Bay, Oregon, and then to the State of Washington where Wood sold the gun and parted company with Johann. Wood was later arrested in Los Angeles, California, by F.B.I. agents to whom he gave a confession.

---

1. Section 76–5–202 in full text provides:

Murder in the first degree.—(1) Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances:

(a) The homicide was committed by a prisoner who is confined in a jail or other penal institution regardless of whether such confinement is legal.

(b) At the time the homicide was committed the actor also committed another homicide.

(c) The actor knowingly created a great risk of death to a person other than the victim and the actor.

(d) The homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, aggravated robbery, robbery, rape, forcible sodomy, or aggravated sexual assault, aggravated arson, arson, aggravated burglary, burglary, aggravated kidnapping or kidnapping.

(e) The homicide was committed for the purpose of avoiding or preventing an arrest by a peace officer acting under color of legal authority or for the purpose of effecting an escape from lawful custody.

(f) The homicide was committed for pecuniary or other personal gain.

(g) After having previously been convicted of first or second degree murder.

(h) The homicide was committed for the purpose of preventing a witness from testifying, or a person from providing evidence, or a person from participating in any legal proceedings or official investigation.

(2) Murder in the first degree is a capital offense.

At trial Wood testified that he did not kill Aasved. His story was that he and Johann passed through Wendover enroute to Salt Lake City where they arrived at about 7:00 p. m. on June 9. Johann then took the automobile for several hours and did not return until after midnight. Wood admitted that he had confessed to F.B.I. agents in Los Angeles, and sought to explain the confession away on the ground that he had suffered from severe depression and had, in effect, been trying to commit suicide.

In his confession, Wood stated that he had been driving the car and was alone when he picked up Aasved and thereafter shot him. At one point in the confession, in response to a question as to why he shot Aasved, he stated: "I figured he had more money. I guess I figured that." At trial, he acknowledged having used Aasved's credit cards, but claimed that he had received them from Johann in Salt Lake City. He also identified the apparent murder weapon, a .22 caliber Ruger revolver, as one he had owned. The gun had been recovered from a person who had purchased it from him in Washington.

A pathologist testified at trial that Aasved suffered four shots to the chest, one to the shoulder, and three to the head, and that death was caused by the chest wounds. The wounds to the head were inflicted either immediately before or immediately after the chest wounds. There was no testimony as to who inflicted the head wounds.

An experienced criminal lawyer was appointed to represent Wood. The case was tried before a jury in the district court for Tooele County. The court charged the jury on the crimes of first degree murder, second degree murder, and manslaughter; the jury returned a verdict of first degree murder. At the presentence hearing, the State adduced no significant evidence of aggravating circumstances beyond that adduced at trial, and, in urging the death penalty, relied almost solely on the circumstances of the crime as aggravating circumstances warranting the death penalty. The State also placed in evidence two letters written by Wood while in jail awaiting trial. The first letter, dated October 11, 1978, contained a further acknowledgment of the commission of the murder and demanded imposition of the death penalty. The second letter, dated October 16, 1978, recanted the statements made in the first letter. In the second letter, Wood claimed that he wrote the first letter because he could not tolerate the conditions in the jail and wanted to obtain the judge's attention in the hope that he might be moved to another jail.

Wood's mitigation evidence showed no prior criminal record and some possibility of organic brain deterioration from prolonged and extensive alcohol abuse. An alcohol abuse counselor employed by Western Airlines, Wood's former employer, testified at the presentence hearing that Wood had all the symptoms of alcoholism including mental blackouts, one of which he had suffered in the counselor's presence. Up until two years prior to the crime, Wood had had a stable work record, having worked for Western Airlines for thirteen years, part of the time as a chief mechanic. His first marriage had continued for seventeen years and ended in divorce, apparently because of alcoholism. Wood is the father of three children from that marriage.

Wood waived his right to have the jury determine whether the sentence should be life imprisonment or death. Before accepting the waiver, the trial judge, on his own initiative, carefully outlined his own background and beliefs to Wood insofar as they might have been thought to bear on the decision to be made. At the conclusion of the presentence hearing, the trial judge found one aggravating factor and three mitigating factors. On the premise that the "preponderance of the evidence" standard should govern whether aggravating factors outweigh mitigating factors, the judge ruled that the aggravating factor preponderated over the mitigating factors, and accordingly imposed the death penalty, even though he indicated that there was a reasonable doubt as to whether the aggravating factor outweighed the mitigating factors.

On this appeal, Wood asserts errors in both the guilt and penalty phases of his trial. We turn first to the penalty phase of the proceeding below and then to the guilt phase.

## I. SCOPE OF REVIEW

 On direct appeal in capital cases, it is the established rule that this Court will review an error, even though no proper objection was made at trial and even though the error was not raised on appeal, if the error was manifest and prejudicial. *State v. Pierre*, Utah, 572 P.2d 1338 (1977); see also *State v. Cobo*, 90 Utah 89, 60 P.2d 952 (1936); *State v. Stenback*, 78 Utah 350, 2 P.2d 1050 (1931). In the penalty phase, it is our duty to determine whether the sentence of death resulted from error, prejudice or arbitrariness, or was disproportionate. *State v. Pierre, supra.*

## II. THE PENALTY PHASE OF THE TRIAL

### A. Constitutional Background

 The Eighth and Fourteenth Amendments to the United States Constitution do not permit imposition of the death penalty in an arbitrary or capricious manner. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The objective of the law is to require that the discretion of a sentencing body in a capital case be carefully channeled by standards designed and applied to insure that there is a reasonable distinction between those murder cases in which the death penalty is imposed and those in which it is not. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). In *Gregg*, the plurality opinion stated that a death penalty sentencing scheme may not "have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." *Gregg v. Georgia*, 428 U.S. at 195, n.46, 96 S.Ct. at 2935, n.46. Standards intended to reduce arbitrariness may not describe all murders so that they fail to provide a rational basis for distinguishing between those cases in which the death penalty is appropriate and those in which it is not. *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

 The Eighth Amendment requires that the state not act in disregard of the humanity of every individual, no matter how far that person may have fallen from the norms of civilized conduct. Even though one has committed a homicide, the law requires some deference to individual characteristics which produce differences in the degree of culpability. Although the Eighth Amendment does not deprive the people, or their agency, the State, of the power to impose the death penalty for those who commit murder, it does require recognition of the fact that even among murderers there are those who are less culpable than others and that the death penalty is not appropriate in all cases. Therefore, the standards which guide the sentencing body must focus on the circumstances of the crime as well as the background and personal characteristics of the defendant. The plurality opinion in *Woodson v. North Carolina*, 428 U.S. at 304, 96 S.Ct. at 2991 stated:

A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of mankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

More recently the Supreme Court in *Eddings v. Oklahoma,* —— U.S. ——, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) stated:

> Beginning with *Furman,* the Court has attempted to provide standards for a constitutional death penalty that would serve both goals of measured, consistent application and fairness to the accused. Thus, in *Gregg v. Georgia,* 428 U.S. 153 [96 S.Ct. 2909, 49 L.Ed.2d 859] (1976), the plurality held that the danger of an arbitrary and capricious death penalty could be met "by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."

Accord, *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). For failure to give individualized consideration to a defendant in a capital murder case, a plurality of the United States Supreme Court has held mandatory death penalties unconstitutional. *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *cf. Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

It is against this constitutional background that we address the issue of whether the death penalty was lawfully imposed in this case.

### B. The Presentence Hearing

Wood contends that for the death penalty to be imposed a comparison must be made between aggravating factors and mitigating factors, and that the former must outweigh the latter "beyond a reasonable doubt." In the penalty hearing, the trial judge found the aggravating outweighed the mitigating factors by a preponderance of the evidence, and imposed the death penalty even though he indicated substantial doubt that the death penalty was appropriate. The issue, therefore, is squarely posed whether a death sentence may be sustained when the mitigating factors are sufficiently strong when compared with the aggravating factors to create a substantial and reasonable doubt that the death penalty is appropriate.

The trial judge explained at some length the factors he considered in the penalty phase and the reasons that persuaded him to reach the conclusion he did. The trial judge expressly found the following three mitigating circumstances: (1) the defendant had "absolutely no past criminal history or record"; (2) he was "somewhat of a sickened individual but not a depraved individual"; and (3) "at the time of the murder, his capacity to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease, intoxication or influence of drugs." As to the absence of prior criminal activity, the trial court stated, "that is very mitigating." The single aggravating circumstance the trial judge found was the "ruthlessness and brutality of the murder," and he ruled that outweighed the mitigating factors.[2]

In determining whether the death penalty should be imposed, the trial judge stated that in his view the test should be whether he could conclude beyond a reasonable doubt that the aggravating outweighed the mitigating factors. Nevertheless, he concluded that the law required that a preponderance of the evidence test be applied. He then stated:

> I will make the specific finding. I *do not find that [the aggravating circumstances outweigh the mitigating circumstances] beyond a reasonable doubt, but I find that the aggravating preponderates.* The jury having found the defendant guilty of a capital murder in the first degree and the *facts preponderating in favor of aggravating over the mitigating circumstances* I have no alternative according to the legislature. The legislature set the penalty, the court doesn't set the penalty. Under the law I am required and mandated that I impose the sentence of death . . . . [Emphasis added.]

2. The transcript uses the term "ruthfullness," but that is undoubtedly a mistranscription of the trial court's language.

## C. The Statutory Guidelines

The Utah statutory provisions governing capital homicide cases provide that after a trier of fact has found a defendant guilty of a capital crime, which requires proof beyond a reasonable doubt of at least one of the statutory aggravating factors,[3] another hearing shall be held to take evidence of additional aggravating factors and any mitigating factors the defendant may be able to prove. Section 76–3–207(1) specifies six mitigating factors which relate either to the particular circumstances under which the crime was committed or to the particular, personal circumstances of the defendant at the time of the crime. That provision also states that "any other fact in mitigation" may be proved.[4]

In addition, § 76–3–207(1) directs the sentencing authority to consider in the presentence hearing "the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty,"

including the aggravating factor or factors under § 76–5–202 proved at the trial of guilt.

However, § 76–3–207 does not indicate what weight should be accorded individual aggravating and mitigating factors, or what standard should govern in reaching a decision based on a comparison of the totality of the aggravating factors and the totality of the mitigating factors. The statute does not even state that a comparison must be made. The sentencing authority is simply directed by § 76–3–207 to "consider the penalty." Obviously, however, it is implicit in the statutory scheme that a comparison of aggravating and mitigating factors must be made and a decision reached based on the result of the comparison. The sentencing authority is not entitled to disregard either the aggravating factors or the mitigating factors because of a personal belief that all homicides should be punishable by death, or, on the other hand, that the death penalty should never be imposed.

---

**3.** See *supra* note 1.

**4.** Paragraphs 1 and 2 of § 76–3–207 provide in full text:

Capital felony—Hearing on sentence.—
(1) When a defendant has been found guilty of a capital felony, there shall be further proceedings before the court or jury on the issue of penalty. The proceedings shall be conducted before the court or jury which found the defendant guilty, provided the defendant may waive hearing before the jury, in which event the hearing shall be before the court. In these proceedings, evidence may be presented as to any matter the court deems relevant to sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court deems to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence. The state's attorney and the defendant shall be permitted to present argument for or against sentence of death. Aggravating circumstances shall include those as outlined in 76–5–202. Mitigating circumstances shall include the following:
 (a) The defendant has no significant history of prior criminal activity;

 (b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;
 (c) The defendant acted under extreme duress or under substantial domination of another person;
 (d) At the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirement of law was substantially impaired as a result of mental disease, intoxication, or influence of drugs;
 (e) The youth of the defendant at the time of the crime;
 (f) The defendant was an accomplice in the murder committed by another person and his participation was relatively minor;
 (g) And any other fact in mitigation of the penalty.
(2) The court or jury, as the case may be, shall retire to consider the penalty. In all proceedings before a jury, under this section, it shall be instructed as to the punishment to be imposed upon a unanimous verdict for death and that to be imposed if a unanimous verdict for death is not found. If the jury reports unanimous agreement to impose the sentence of death, the court shall discharge the jury and shall impose the sentence of death. If the jury is unable to reach a unanimous verdict imposing the sentence of death, the court shall discharge the jury and impose the sentence of life imprisonment.

The precise issue raised by Wood in this case has not been addressed before by this Court. In *State v. Pierre*, Utah, 572 P.2d 1338 (1977), it was argued, relying on *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), that the Due Process Clause of the Fourteenth Amendment required the State to "prove beyond a reasonable doubt *the absence of any mitigating factor which the defendant raises ...*" (emphasis added). 572 P.2d at 1346. We held that *Mullaney* applied only to the prosecution's burden in the guilt phase of the trial and not to the presentence hearing in a capital case. Other courts have also rejected the same argument and held that due process does not require the prosecution to prove beyond a reasonable doubt the absence of mitigating factors. *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), cert. denied, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979); *Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980); *State v. Barfield*, 298 N.C. 306, 259 S.E.2d 510 (1979). Furthermore, whatever remote relevance *Mullaney* has in a capital presentence hearing has been further attenuated by the more recent decision in *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

We also held in *Pierre* that § 76–3–207(2) did not require the prosecution to prove beyond a reasonable doubt the absence of mitigating factors. To have ruled otherwise, would have made the statute unworkable. A defendant could have raised any number of mitigating factors, and made it virtually impossible for the prosecution to disprove them all, especially since most, if not all, statutory mitigating factors stated in § 76–3–207(1) require judgments as to the degree to which they exist, and are not simple "either/or" propositions.[5]

Although we rejected the position urged by the defendant in *Pierre*, we did hold that

the State had the "burden of proof necessary for a verdict of death over life imprisonment and that the totality of evidence of aggravating circumstances must therefore outweigh the totality of mitigating circumstances." *Pierre*, 572 P.2d at 1347–48. Accord, *State v. Brown*, Utah, 607 P.2d 261 (1980); *Pierre v. Morris*, Utah, 607 P.2d 812 (1980). However, the Court did not specify what the requisite standard of persuasion or certitude was to justify the determination that aggravating outweighed mitigating circumstances. Nevertheless, we did hold, on an independent review of the evidence of aggravating and mitigating factors, pursuant to our duty to make such a review, that "the aggravating circumstances were overwhelmingly present against the defendant and the mitigating circumstances favoring him most minimal—even from the point of view of inference." *Pierre*, 572 P.2d at 1348.[6]

### D. Substantial Doubt as to the Appropriateness of the Death Penalty

We reject the proposition that the death penalty may be imposed when there is substantial doubt whether it should be. To accept that proposition would be to permit the sentencing authority to assume an almost casual attitude in imposing capital punishment—the most solemn and final act that the state can take against an individual. That the defendant acted in a reprehensible and even vicious manner cannot justify the state's departure from strict adherence to basic principles of justice. For our system of justice to command the respect of society, the law must be applied, in all cases, in a judicious and even-handed manner. We recognize that there is a divergence of views as to the reasons which support the death penalty, but regardless of whether the reason relied on is deterrence, retribution, or some other reason, the death penalty may be imposed only when consist-

---

**5.** Paragraph (1)(a) of § 76–3–207 speaks of "no significant history of prior criminal activity"; (b) refers to "extreme mental or emotional disturbance"; (c) refers to "extreme duress or ... substantial domination of another ..."; (d) refers to the defendant's mental capacity being "substantially impaired"; and (f) to "relatively minor" participation in the crime. See *supra* note 4.

**6.** Compare the language in *Proffitt v. Florida*, 428 U.S. 242, 249, 96 S.Ct. 2960, 2965, 49 L.Ed.2d 913 (1976).

ent with "the fundamental respect for humanity underlying the Eighth Amendment." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

That can only be achieved if sentencing procedures only permit imposition of the death penalty on the basis of a high degree of confidence that that penalty is appropriate. The plurality opinion in *Woodson*, 428 U.S. at 305, 96 S.Ct. at 2991, states:

> Death in its finality, differs from life imprisonment more than a hundred-year prison term differs from one of only a year or two. *Because of that quantitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.* [Emphasis added.]

See also *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978).

Nowhere in the law is the interplay of procedural rules and substantive standards more critical than in the penalty phase of a capital case. The substantive standards must be "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson*, 428 U.S. at 303, 96 S.Ct. at 2991. It makes no difference, however, how rational and discriminating the substantive standards are, if the procedural rules which implement those standards do not provide an effective mechanism for their faithful implementation. Even if Solomon-like wisdom were available in framing objective standards, their whole purpose could be thwarted if the governing procedural rules allowed the sentencing body to impose the death penalty in the face of evidence which creates a reasonable or substantial doubt as to the appropriateness of that penalty.

■ To assure that the substantive standards that govern imposition of the death penalty are fairly, evenhandedly, and properly applied, the basic procedural requirements of the Due Process Clause of the Fourteenth Amendment must be observed. *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Thus, it is a violation of that clause if a defendant is sentenced to death on the basis, in part, of confidential information not disclosed to a defendant or his counsel, *id.; Spaziano v. State*, Fla., 393 So.2d 1119 (1981); or when a presentence report was shown to counsel but not defendant, *Raulerson v. Wainwright*, 508 F.Supp. 381 (M.D.Fla.1980); or when defense counsel was not given adequate time to review a complicated presentence report, *State v. Phelps*, N.D., 297 N.W.2d 769 (1980). Death sentences have also been set aside because of 1) inadequate representation by counsel, *Young v. Zant*, 506 F.Supp. 274 (M.D.Ga.1980); *Voyles v. Watkins*, 489 F.Supp. 901 (N.D.Miss.1980); see also *People v. Frierson*, 25 Cal.3d 142, 158 Cal.Rptr. 281, 599 P.2d 587 (1979); *State v. Myles*, La., 389 So.2d 12 (1980); 2) admission of evidence of other crimes for which defendant had not been convicted, *Presnell v. Georgia*, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978); *State v. McCormick*, Ind., 397 N.E.2d 276 (1979); and 3) the prosecution's failure to disclose the name of a crucial witness so that the defendant was unable to respond, *Smith v. Estelle*, 602 F.2d 694 (5th Cir. 1979). See also *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967) where, in a noncapital case, the "full panoply" of the relevant due process guarantees in state criminal proceedings were held to apply in a hearing to determine punishment under a state sex offenders act authorizing enhanced punishment if the trial judge found that the defendant "would constitute a threat of bodily harm to members of the public or that he was an habitual criminal or mentally ill." *Id.* at 608, 87 S.Ct. at 1211. The Court held that in such a proceeding, the defendant "must be afforded all those safeguards which are fundamental rights and essential to a fair trial." *Id.* at 609–610, 87 S.Ct. at 1212.

In all litigation, both civil and criminal, there is always the possibility of error. *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). In civil cases, disputes are resolved despite substantial doubt about the accuracy of the factual

conclusions underpinning a judgment. But in our tradition, both in the United States and in the State of Utah,[7] the criminal law does not allow the deprivation of liberty unless substantial doubt of guilt is excluded. The reasonable doubt standard was first adopted by the common law approximately two centuries ago. C. McCormick, Evidence § 341 (2d ed. 1972); 9 J. Wigmore Evidence § 2497 (Chadbourn rev. 1981). The basic reasons supporting that standard were enumerated in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). "The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" *Id.* at 363, 90 S.Ct. at 1072. The transcending values at stake in criminal proceedings require a far more stringent standard than in civil cases. "[T]he reasonable-doubt standard is indispensable, for it 'impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issues.'" *Id.* at 364, 90 S.Ct. 1072. It is not only the interest of the individual that is at stake, it is also the integrity of the criminal justice system itself. The "use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law." *Id.* Thus, "[i]t is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.* In a concurring opinion in

*Winship*, Justice Harlan stated that the standard of proof should "instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Id.* at 370, 90 S.Ct. at 1076.

The United States Supreme Court has not addressed the specific issue as to what standard of persuasion the Eighth Amendment through the Due Process Clause of the Fourteenth Amendment, or that clause by itself, requires in imposing the death penalty.[8] Because *Winship* dealt with fact finding in a delinquency proceeding, it is, of course, distinguishable. Whether the United States Supreme Court would hold that the reasonable doubt standard must be applied in presentence hearings in capital cases as a requirement either of the Eighth or the Fourteenth Amendments, is problematic because of the wide variety of state statutory schemes that exist. The conclusion in any particular case might well turn on the over-all effectiveness of the statutory scheme in minimizing capriciousness.

In any event, we address neither the federal nor the state constitutional issues because the case can be decided on the preferred grounds of statutory construction. It is a fundamental rule that we should avoid addressing a constitutional issue unless required to do so. *Hoyle v. Monson*, Utah, 606 P.2d 240 (1980). See also *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Swensen v. Buildings, Inc.*, 93 Idaho 466, 463 P.2d 932 (1970). As a corollary of that principle, we construe statutes, if possible, to avoid the risk of running afoul of constitutional prohibitions. *In re Boyer*, Utah, 636 P.2d 1085

---

7. Unlike some other jurisdictions, Utah imposes on the prosecution the burden to disprove the existence of affirmative defenses beyond a reasonable doubt once the defendant has produced some evidence of the defense. *State v. Green*, 86 Utah 192, 40 P.2d 961 (1935); *State v. Harris*, 58 Utah 331, 199 P. 145 (1921); *State v. White*, 40 Utah 342, 121 P. 579 (1912); *State v. Vacos*, 40 Utah 169, 120 P. 497 (1911). See also § 76–1–502. In civil cases where there are significant intrusions on the liberties of an indi-

vidual, as in involuntary commitment proceedings, the usual preponderance of the evidence standard does not apply. Rather, the standard of persuasion is clear and convincing evidence. § 64–7–36(10). The same standard is required in guardianship cases. *In re Boyer*, Utah, 636 P.2d 1085 (1982).

8. In the cases which have been before that Court, that issue apparently has not been addressed.

(1982); *Ellis v. Social Services Department*, Utah, 615 P.2d 1250 (1980); *Gord v. Salt Lake City*, Utah, 20 Utah 2d 138, 434 P.2d 449 (1967). When the Legislature has not specified the requisite standard of persuasion or certitude necessary in an adjudication, it is the duty of the Court to fill such a gap by weighing the relative interests of the State and the defendant in light of potential constitutional considerations and legislative intent to determine what the degree of persuasion ought to be. *In re Boyer*, 636 P.2d at 1091.

The Legislature has provided general standards for guidance in construing the criminal code. Section 76–1–104(3) and (4) provide that the provisions of the code are to be construed to "[p]rescribe penalties which are proportionate to the seriousness of the offenses" and to "[p]revent arbitrary or oppressive treatment of persons accused or convicted of offenses." Section 76–1–106 reinforces § 76–1–104 by providing that "*[a]ll provisions of this code* and offenses defined by the laws of this state *shall be construed . . . to effect the objects of the law and general purposes* of § 76–1–104" (emphasis added). These provisions apply with particular force in capital cases because of the gravity of the decision to be made and the constitutional environment in which that decision must be made.

Therefore, construing § 76–3–207, which deals with sentencing in capital cases, in light of the legislative purposes stated in § 76–1–104(3) and (4) and § 76–1–106, we conclude that the stated objectives cannot be consistently achieved in a capital case unless the decision to impose the death penalty is made on the basis of the reasonable doubt standard. To impose the death penalty, notwithstanding serious doubt as to its

appropriateness, would create in some cases—as in this case—a substantial possibility of "arbitrary . . . treatment" and permit "penalties which are [not] proportionate," a result that is forbidden by the Legislature and that would raise issues of a possible constitutional magnitude.[9] Furthermore, in our view, the reasonable doubt standard also strikes the best balance between the interests of the state and of the individual for most of the reasons stated in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

#### E. The Burden of Persuasion

In our per curiam decision in this case decided September 21, 1981, *State v. Wood*, Utah, 648 P.2d 71 (1981), we held:

It is our conclusion that the appropriate standard to be followed by the sentencing authority—judge or jury—in a capital case is the following:

After considering the totality of the aggravating and mitigating curcumstances, you must be persuaded beyond a reasonable doubt that total aggravation outweighs total mitigation, and you must further be persuaded, beyond a reasonable doubt, that the imposition of the death penalty is justified and appropriate in the circumstances.

▬ These standards require that the sentencing body compare the totality of the mitigating against the totality of the aggravating factors, not in terms of the relative numbers of the aggravating and the mitigating factors, but in terms of their respective substantiality and persuasiveness. Basically, what the sentencing authority must decide is how compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factors. The sen-

9. Under Utah law the sentencing procedure in capital cases is fundamentally different from the procedure in other criminal cases, and, therefore, the ruling of this case is limited to capital cases. In noncapital cases, the trial judge has broad discretion in selecting an appropriate punishment from among a number of alternatives, see *State v. Lipsky*, Utah, 608 P.2d 1241 (1980), and the sentence need not be based on evidence in addition to that adduced at trial. In capital cases, there must be a separate evidentiary hearing, Utah Code Ann., 1953, § 76–3–207, which is clearly adversarial and adjudicatory in nature. The sentence must be based on the evidence properly before the court, and the decision is a forced choice between one of only two alternatives. The reasonable doubt standard does not properly lend itself to reaching a decision when a choice must be made among many alternatives. Furthermore, once a jail sentence is imposed, it is subject to the continuing jurisdiction of the Board of Pardons. Such a sentence is not irrevocable, as is a death sentence.

tencing body, in making the judgment that aggravating factors "outweigh," or are more compelling than, the mitigating factors, must have no reasonable doubt as to that conclusion, and as to the additional conclusion that the death penalty is justified and appropriate after considering all the circumstances. This means that upon consideration of all of the circumstances relating to this defendant and this crime the sentencing authority must be convinced beyond a reasonable doubt that the death penalty should be imposed.

Although we speak of "weighing" the aggravating and mitigating factors, we realize that the term "weighing" is often used in determining the truth or falsity of factual propositions. In the context of a penalty hearing, however, that term is akin to a metaphor which is not altogether descriptive of the mental process involved. The ultimate purpose in the penalty phase is not one of factfinding,[10] but the fixing of a penalty, and the fixing of a penalty is a matter of judgment about what penal consequences should attach to the commission of a capital crime by a particular defendant.[11] The reasonable doubt standard is, of course, also employed as a standard for factfinding; but that standard, which is only used when the most basic interests of the individual are at stake, also conveys to a decision maker a sense of the solemnity of the task and the necessity for a high degree of certitude, given the nature of the values to be weighed, in imposing the death sentence.

The standards enunciated in this case are not without precedent. Other states have adopted a variety of procedures in capital cases which employ the reasonable doubt standard in the penalty phase, often at multiple decision making points. In Arkansas the reasonable doubt standard governs three critical conclusions in the presentence hearing: all aggravating circumstances

10. Clearly there may be the necessity for making findings as to the factual basis of certain mitigating or aggravating circumstances which are disputed. This function is no different than the usual fact finding function.

11. Stewart, J., in a concurring opinion in *State v. Brown*, Utah, 607 P.2d 261, 275 (1980), stated:

Whether aggravating circumstances outweigh mitigating circumstances cannot be determined by the same mental processes by which direct and circumstantial evidence are evaluated for determining such questions as who entered an intersection first. The process of weighing and evaluating evidence to determine the existence of a factual proposition is a process common to the ordinary activities of life. The reference points are facts and inferences from facts; the process is one of logic and practical experience. The point of evaluating aggravating and mitigating circumstances in a capital case is not to prove a factual proposition but to determine a punishment. Section 76–3–207 provides, for example, that the youth of the defendant and a lack of significant history of prior criminal activity are mitigating circumstances. The youth of the defendant, or the lack of prior criminal activity, cannot be "weighed" in any meaningful sense against the aggravating facts. How does one find that the "fact" that the age of the defendant, whether 18 or 30 years, does or does not preponderate against an aggravating circumstance? How does one make such a determination if the defendant had a shoplifting conviction or embezzlement conviction ten years previous to the murder? To speak of weighing those factors against the aggravating circumstances is to employ an appealing but meaningless metaphor which in fact gives the mind no guidance in resolution of such an overwhelmingly important question.

The "beyond a reasonable doubt" standard may, of course, be considered similar in its function to proof by a preponderance of evidence, i.e., both standards are used to resolve factual disputes. However, the term "beyond a reasonable doubt" is something more than a standard for evaluating conflicting facts and inferences; in the context of a penalty hearing, it also conveys to the jury the concept that the values upon which the criminal justice system is built do not permit the ultimate sanction to be imposed unless the conclusion is free of substantial doubt .... That standard would require more than a factual determination; it would, as contemplated by the statute, take into account the tolerable frailties of human beings. It is, after all, in deference to those frailties that the jury is required to consider mitigating circumstances.

The U.S. Supreme Court has stated that decisions of the type made in the penalty phase are not unknown in other areas of the law and that the process of weighing mitigating and aggravating factors is not unconstitutional on grounds that the standards are so vague as to permit arbitrariness. *Proffitt v. Florida*, 428 U.S. 242, 257–258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976).

must be proved beyond a reasonable doubt; it must be determined beyond a reasonable doubt that the aggravating circumstances "outweigh . . . all mitigating circumstances found to exist," and it must be determined beyond a reasonable doubt that aggravating circumstances "justify a sentence of death." Ark.Stat.Ann. § 41–1302 (1977).[12] The State of Washington requires that the jury be convinced beyond a reasonable doubt that "there are not sufficient mitigating circumstances to merit leniency." Wash.Rev.Code, § 10.95.060 (1981). Under the Texas death penalty statute, which was the subject of *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the jury must find beyond a reasonable doubt affirmative answers to three questions. One of the critical questions is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim.Proc.Ann. art. 37.071 (Vernon 1981). In answering that question, the jury is required to consider whatever mitigating factors the defendant can prove. See *Jurek v. Texas,* 428 U.S. at 272, 96 S.Ct. at 2956. Under Florida law, a similar standard obtains when the trial judge overrides a jury recommendation of leniency. The judge must find that "the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." *Tedder v. State,* Fla., 322 So.2d 908, 910 (1975) (quoted in *Proffitt v. Florida,* 428 U.S. 242 at 249, 96 S.Ct. 2960 at 2965, 49 L.Ed.2d 913 (1976)). In North Carolina it is necessary to find beyond a reasonable doubt 1) that there is an aggravating circumstance, 2) that the mitigating circumstances are "insufficient to outweigh the aggravating circumstances," and 3) that the aggravating circumstance is sufficiently substantial to call for imposition of the death penalty." *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569, 577 (1979).

## F. The Aggravating Factors

In a capital penalty proceeding, it is essential that the sentencing authority consider and weigh only proper mitigating and aggravating factors. In this case, the only statutory aggravating factor proved was that the murder was committed for the purpose of robbing Aasved—the factor that made the murder a capital crime.

In the penalty phase, the trial judge found only one aggravating circumstance, and he gave it decisive weight. He stated: "the only aggravating circumstance, and I do see [an] aggravating circumstance, is the ruthlessness and brutality of the murder . . . ." He specifically found that this single factor outweighed the absence of Wood's prior criminal activity, his diminished mental capacity, and a "sickened" but not "depraved" condition.

Clearly, the trial judge was entitled to rely on the statutory aggravating factor of the robbery, which was proved in the guilt phase, in comparing aggravating and mitigating factors. Nevertheless, he found only the one aggravating factor stated above; he did not indicate that he in fact considered robbery in the "weighing" process, and we, of course, must take the record as it stands.

Under the rule established in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), there was error in the weighing process in this case because the trial court relied on an aggravating circumstance which, without some limitation, is improper. In *Godfrey,* the Supreme Court set aside a death sentence based on an aggravating factor essentially the same as that relied on by the trial court in this case.

---

**12.** Despite suggestions to the contrary, the standards set forth here do not serve to destroy the death penalty. For instance, the Arkansas Supreme Court affirmed the imposition of the death penalty in *Miller v. State,* 269 Ark. 341, 605 S.W.2d 430 (1980). In *Swindler v. State,* 264 Ark. 107, 569 S.W.2d 120 (1979), and in *Ruiz v. State,* 265 Ark. 875, 582 S.W.2d 915 (1979), the trial court also imposed the death penalty; however, the Arkansas Supreme Court reversed and remanded for failure to grant a change of venue. The death penalty was again imposed by the trial court in *Westbrook v. State,* 265 Ark. 736, 580 S.W.2d 702 (1979), but the Arkansas Supreme Court reversed for failure to grant a hearing on a motion to disqualify the judge, a failure to make findings whether the defendant was fit to stand trial, and a failure to grant a continuance to obtain evidence of mental disease.

The aggravating factor in question was that the murder was "outrageously or wantonly vile, horrible and inhuman."[13] Accord, *State v. Dixon*, Fla., 283 So.2d 1 (1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974); *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981); *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881, (1977), cert. denied, 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977).

*Godfrey* held that such an aggravating factor had to be narrowed to meet constitutional standards because, as applied, it was so broad as to describe all murders, and because it described all murders, it allowed the jury unlimited discretion in imposing the death penalty. Thus, "[t]here is no principled way to distinguish this case, in which the death penalty was imposed" from those in which it would not be. *Id.* 446 U.S. at 433, 100 S.Ct. at 1767. Therefore, as to any class of capital murders under Utah law, "ruthlessness and brutality," as an aggravating factor, must be limited to those murders involving an aggravated battery or torture.[14]

■ We conclude that the sentencing process was flawed because the aggravating factor relied on was constitutionally impermissible in this case, since it describes all murders and therefore fails to provide any guideline for channeling discretion.

### G. Psychiatric Evaluation

■ Wood, an indigent, asserts error in the trial court's refusal to order a psychiatric evaluation by the Division of Corrections pursuant to § 76–3–404 for use in the presentence hearing. Whether the appointment of an alienist is made under § 76–3–204, or in another manner, we agree that Wood was entitled to psychiatric or psychological assistance in the penalty phase beyond that which had been afforded him prior to trial. Because Wood felt that the psychiatrist appointed was to be used to establish his defense counsel's theory of defense, which was inconsistent with his own theory of defense (see Section III–E of this opinion, *infra*), it appears that there was not a full and complete examination prior to trial. Indeed no psychiatric evidence was offered at trial.

In a capital case, a defendant has a right to have the sentencing authority consider evidence relating to his character and background. *Eddings v. Oklahoma*, —— U.S. ——, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, '98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). "What is essential is that the [sentencing authority] have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976). In *Lockett*, 438 U.S. at 605, 98 S.Ct. at 2965, the Court stated:

> ... the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, *any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.* [Emphasis added; footnotes and original emphasis omitted.]

Section 76–3–207(1) provides a defendant in a capital case the broad right to adduce evidence as to his "character, background, history, [and] mental and physical condition."[15] Furthermore, psychiatric testimony may be particularly relevant to two of the mitigating circumstances specified in

---

**13.** Unlike the Utah statutory scheme, Georgia law does not require that any aggravating circumstance be proved in the guilt phase of a capital murder trial. Under that law, aggravating circumstances are considered only in the presentence hearing. In Utah "ruthlessness and brutality" is not one of the aggravating factors that would make a murder a capital offense. See *supra* note 1.

**14.** In *State v. Codianna*, Utah, 573 P.2d 343 (1977), the trial court relied on ruthlessness and brutality as an aggravating factor on facts that supported a conclusion that there was an aggravated battery.

**15.** See *supra* note 4.

§ 76–3–207(1). Subparagraph (b) of that section states that one factor to be considered in mitigation is whether "[t]he murder was committed while the defendant was under the influence of extreme mental or emotional disturbance." Subparagraph (d) provides that evidence of the defendant's inability to conform his conduct to the law because he was substantially impaired by "mental disease, intoxication, or influence of drugs" shall be considered in mitigation.

As the trial judge found, this was not a clear-cut case for the death penalty. Wood's "background, history and mental and physical condition" were factors to be considered. With reference to those factors and the mitigating factors stated in § 76–3–207, the trial court, on the basis of the testimony adduced, found Wood "somewhat of a sick individual" but not a "depraved individual," who suffered from some degree of diminished capacity, and had been a law-abiding person with a relatively stable personal history prior to the crime.

A professional evaluation of Wood's physical and mental state may have been particularly relevant.[16] He had a long history of alcoholism with the possibility that it had produced some brain damage. According to Johann's testimony, Wood exhibited some bizarre behavior at about the time of the murder:

Q. What is this rockets coming out of the sun or moon, did he say that?

A. Yes, he did.

Q. And did he say that immediately afterwards?

A. I don't know if it was right immediately afterwards. It was—he said it on occasion, yes.

Q. Did he say it on that occasion?

A. Yes, he did.

An alcohol abuse counselor for Wood's former employer, Western Airlines, testified at the presentence hearing:

Q. In the history that he related to you did he relate any other symptoms of his alcohol problem?

A. [By Miles Patrick, alcohol drug abuse counselor] He [defendant] had them all as I recall.

Q. What are all of them?

A. He indicated blackouts, it was my opinion that while he was in the office that he was suffering periodic blackouts—

MR. WATSON: I will object again Your Honor.

THE COURT: That will be sustained . . . . [17]

■ The extended abuse of alcohol need not produce outright insanity before it is relevant in the penalty phase of a capital offense trial. Long term alcoholism may produce pathological conditions short of legal insanity. There is evidence that those conditions include cerebral lesions or atrophies which may cause epileptic crises, brain trauma, temporal lobe dysfunctions leading to an increased probability of violent behavior, acute confusional states, and the inducement of R.E.M.–sleep deprivation which leads to near psychotic reactions and violence. Pernanen, Alcohol and Crimes of Violence, in 4 Social Aspects of Alcoholism 351 (1976).

In addition to evidence of alcoholism, there was some evidence that Wood suffered from severe depression. He claimed that he was so depressed as to be suicidal. Expert testimony was necessary to make a proper evaluation of this claim and the nature and effects of the alcoholism.

---

16. As noted in the text, we are aware that prior to trial Wood was afforded psychiatric assistance. The record does not disclose just how much of an examination was made. Notwithstanding Wood's subsequent request for expert help, we see nothing in his actions designed to disrupt or unduly prolong the trial. Because psychiatric evidence might have been crucial in the penalty phase, we think, given the nature of the proceeding, that it would be unduly harsh to hold, on the facts of this case, that Wood waived his right to obtain a psychiatric examination. Nonetheless, the trial court in a capital case need not countenance tactics designed to be disruptive or to protract a trial without a valid reason.

17. It appears that both the objection and the ruling were improper. Under the standards of the Utah statute that evidence was clearly admissible. See Washington v. Watkins, 655 F.2d 1346 (5th Cir. 1981).

Diminished mental capacity is a mitigating factor under § 76–3–207(d).[18] The law in this state is in conformity with the statement in *State v. English*, La., 367 So.2d 815, 819 (1979):

> [I]t is obvious to us that the legislature intended to permit the jury *to take into consideration, in deciding not to impose the death penalty, an abnormal mental condition short of legal insanity.* It may be a mental disease or defect which diminishes the offender's capacity for self-control and for forming the specific and deliberate intention to cause the killing charged, *or it might be such other mental disease or defect affecting the act as the jury might feel was of a nature that indicated that the ultimate penalty of death should not be imposed.* [Emphasis added].

The refusal to grant an indigent defendant's timely motion for psychiatric assistance in a capital case is an abuse of the discretion, whether the motion is based on § 76–3–404 [19] or some other ground. It is also a denial of due process. *United States v. Pate*, 345 F.2d 691 (7th Cir. 1965); *Blake v. Zant*, 513 F.Supp. 772 (S.D.Ga. 1981); *Cf. Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Although it is not our intention to open the door to abuse by permitting defendants successive demands for psychiatric assistance, we think the request in this case should have been granted.

### H. Conclusion

On the facts of this case, the three errors discussed above, 1) application of an erroneous standard of persuasion in the penalty phase; 2) the weighing of an improper aggravating factor, and 3) the failure to order a psychiatric examination for use in the penalty phase, were prejudicial and compel us to set the death penalty aside.

## III. THE GUILT PHASE OF THE TRIAL

Wood raises several claims of error in the guilt phase of the trial relating to evidentiary rulings and the instructions.

### A. Change of Venue

Wood argues that the trial court erred in denying his motion for a change of venue which asserted that a fair trial could not be had in Tooele County. The contention is without merit.

A defendant has the burden of proving that a "fair and impartial trial cannot be had in the county where the action is pending." § 77–26–1.[20] Wood's motion for a change of venue was supported only by his counsel's affidavit to which was attached a single newspaper article reporting the victim's father's gratitude for the manner in which Aasved's family had been taken care of by local authorities. The article also reported a short and accurate account of a few of the basic facts of the crime and the names of the two persons who had been charged, Johann and Wood.

The affidavit and the newspaper article fell far short of demonstrating that there was such a tainted community attitude that a fair and impartial trial was not likely. In substance, Wood offered nothing more than a bare allegation of prejudice in the county. A mere allegation is patently not adequate to justify a change of venue. *State v. Gellatly*, 22 Utah 2d 149, 449 P.2d 993 (1969).

Wood also argues that the possibility of prejudice existed because of the small, close-knit religious nature of Tooele County and because the victim was a minister. Even if those allegations were taken as true, they add nothing of substance to the claim. The *voir dire* examination of the prospective jurors on the morning of trial

---

18. It may also be a partial defense in the guilt phase of a capital case in the sense that, if it negates a necessary specific intent, the crime would be reduced in degree to second degree murder. See Part II–C of this opinion, *infra*.

19. See generally *State v. Gerrard*, Utah, 584 P.2d 885 (1978).

20. This provision is now found in Utah Code Ann., 1953, § 77–35–29(c).

disclosed no juror bias such as would make a fair trial unlikely, and counsel for both sides passed the jury for cause.

■ There is no basis for concluding that Wood did not receive a trial before a "fair and impartial jury free from outside influences." *State v. Pierre*, Utah, 572 P.2d 1338, 1348 (1977). "The mere general showing of publicity thought to be adverse to a party is not sufficient to require a change of venue except in the most extraordinary cases. In the usual situation, the movant must at least make a showing that the allegedly prejudicial material reached the veniremen, so that a foundation is laid for the possibility of actual bias." *Northern California Pharmaceutical Association v. United States*, 306 F.2d 379, 383 (9th Cir. 1962).[21]

No such showing was made in this case.

### B. Sufficiency of the Evidence

■ Wood asserts that there is insufficient evidence to support a conviction of first degree murder. The attack is not on the evidence of homicide; rather it is on the evidence supporting the intent to kill Aasved for his money—an element necessary to make the murder a capital offense rather than second degree murder.[22]

Essentially, the argument is that Wood's confession, in which he stated he had killed Aasved for his money, is not sufficient to support the motive of robbery. Wood argues that his admission was produced by overreaching and impropriety on the part of the interrogators. He also argues that his admission as to the purpose of the killing was an afterthought, not to be relied on. He does not contend that the confession was coerced, or that there was a violation of the *Miranda* rule, and the record unequivocally demonstrates that there is no foundation for any such claim.

The jury was unquestionably entitled to believe Wood's confession that he killed Aasved for his money. Although there is some circumstantial evidence which also supports that motive, as well as some evidence inconsistent with it, the statements in the confession were, by themselves, sufficient to sustain the necessary finding.

The rule in this jurisdiction as to appellate review of the sufficiency of the evidence in a criminal case is that when the jury acting fairly and reasonably could find the defendant guilty beyond a reasonable doubt on the basis of the evidence and the logical inferences arising therefrom, the verdict will not be disturbed. *State v. Ward*, 10 Utah 2d 34, 347 P.2d 865 (1959); *State v. Sullivan*, 6 Utah 2d 110, 307 P.2d 212 (1957); *State v. Shonka*, 3 Utah 2d 124, 279 P.2d 711 (1955).

The jury's verdict of guilt was amply supported by the evidence.

### C. Rulings on Intoxication

The defendant asserts error in the trial court's restriction of intoxication evidence to the day of the crime and a few days prior thereto, and in the court's refusal to give an intoxication instruction.

■ Intoxication per se is not a defense to a criminal charge. Section 76–2–306 provides that "[v]oluntary intoxication shall not be a defense to a criminal charge unless such intoxication negates the existence of the mental state which is an element of the offense." Nor is it a defense to a crime that a defendant is an alcoholic. *State v. Shelton*, 71 Wash.2d 838, 431 P.2d 201 (1967). An alcoholic may at different times be intoxicated to varying degrees, and may at times be sober. Evidence of intoxication must have relevance to the defendant's mental state at the time of the crime. *State v. Durgin*, 110 Ariz. 250, 517 P.2d 1246 (1974); *State v. Corley*, 108 Ariz. 240, 495 P.2d 470 (1972).

---

**21.** It is significant that *Northern California Pharmaceutical* refers to "the usual situation." In recent years the courts have become more sensitive to the effect of community bias on the fairness of a trial, especially in unusual cases. Compare *State v. BeBee*, 110 Utah 484, 175

P.2d 478 (1946) with, e.g. *Pamplin v. Mason*, 364 F.2d 1 (5th Cir. 1966) and *Maine v. Superior Court of Mendocino County*, 68 Cal.2d 375, 66 Cal.Rptr. 724, 438 P.2d 372 (1968).

**22.** See *supra* note 1.

In the instant case, the prosecution had to prove that at the time of the shooting, Wood had the intent or purpose to commit robbery. If intoxication is so great as to negate the existence of a necessary specific intent for first degree murder, the crime is reduced to second degree murder. *Commonwealth v. Pickett*, 244 Pa.Super. 433, 368 A.2d 799 (1976). See generally, *State v. Norman*, Utah, 580 P.2d 237 (1978). However, for Wood to have been successful, he had to prove much more than he had been drinking. It was necessary to show that his mind had been affected to such an extent that he did not have the capacity to form the requisite specific intent or purpose, prior to the murder, to commit robbery.[23] See *State v. Hartley*, 16 Utah 2d 123, 396 P.2d 749 (1964); *State v. Turner*, 3 Utah 2d 285, 282 P.2d 1045 (1955); *State v. Stenback*, 78 Utah 350, 2 P.2d 1050 (1931); *State v. Diaz*, 76 Utah 463, 290 P. 727 (1930); 2 Wharton's Criminal Law § 108 (14th ed. 1979).

The trial court ruled that Wood's attempt to adduce evidence of his alcohol consumption during the nine months prior to the crime, was not relevant and therefore inadmissible. Testimony as to his consumption of alcohol was limited to the nine-day period preceding the crime. The evidence as to his consumption of alcohol during that time was not altogether consistent. Wood testified that he consumed "moderate amounts" of vodka, one-half pint to a pint each day, "spread thinly" from morning to night. Johann testified that defendant drank as much as he could get, about a fifth a day, and that on the night of the crime, Wood had had two drinks in Wendover, a town not far from the place of the crime. Neither Johann nor Wood (who testified he was not at the scene of the crime) testified that Wood's faculties were impaired by

drinking or that he was drunk at the time of the crime.

There was no error in confining the evidence of drinking to the nine-day period prior to the crime. We recognize that long continued intoxication may produce a physical deterioration or disease of the brain to such an extent that a person may not be held to have a particular criminal state of mind. In a severe form, as discussed in Section II–G, *supra*, the condition produced may be similar to insanity produced by other causes. *People v. Griggs*, 17 Cal.2d 621, 110 P.2d 1031 (1941); R. Perkins, Criminal Law 906 (2d ed. 1969). A possibility that Wood suffered from some degree of an abnormal or pathological mental state was suggested by the evidence in the penalty phase of the trial. However, for Wood to have proved that he suffered from a pathological mental state relevant in the guilt phase, he had to produce expert testimony to establish such a condition. Trial counsel, prior to the trial, arranged for an examination by a prominent forensic psychiatrist, but Wood refused to cooperate with him. No expert evidence, therefore, was produced at trial, and there was no reason for the trial court to have allowed evidence of Wood's drinking habits beyond what was allowed.

Wood was entitled to an instruction on intoxication if there was any evidence to support it. *State v. McCumber*, Utah, 622 P.2d 353 (1980); *State v. Castillo*, 23 Utah 2d 70, 457 P.2d 618 (1969); *State v. Newton*, 105 Utah 561, 144 P.2d 290 (1943). Although Wood had imbibed some alcohol, there is no evidence he was so intoxicated at the time of the crime that he was unable to form the specific intent necessary to prove the crime of robbery.[24] The trial court's refusal to give an intoxication in-

---

**23.** Wood asserts that the evidence was relevant to a defense of diminished capacity. See *State v. Sessions*, 645 P.2d 643 (1982); *State v. Green*, 78 Utah 580, 6 P.2d 177 (1931). As noted in *Sessions*, the diminished capacity defense is essentially a defense which may reduce the degree of a crime within a category because the requisite mental element for the higher de-

gree is absent, but it is not a defense that absolves one of all criminal liability.

**24.** In this case, it was necessary that, at the time of the murder, Wood had the purpose in mind to rob the victim and also the specific intent to rob.

struction, if error at all, was harmless error.[25]

### D. Accomplice Instruction

■ Wood also contends that the trial court erred in refusing to give a cautionary instruction on accomplice testimony. Certainly, the testimony of one of two persons jointly charged with first degree murder who plea bargains out of the charge to give critical testimony against the other, ought to be viewed with great suspicion. However, in this case Wood was not convicted solely on Johann's testimony. Wood's confession admitted all the elements of the crime. Even if the jury had been given a cautionary instruction, there is no reasonable likelihood that it would have had any effect. In his confession, Wood corroborated the most essential aspects of Johann's testimony. The refusal to give the instruction was not prejudicial.

### E. Ineffective Representation of Counsel

Wood further contends that he was denied the effective assistance of counsel.[26]

The argument is that defense counsel refused to present the defense of innocence, not that they failed to perform their professional duties in a competent manner with respect to the other defenses presented. In the judgment of trial counsel, the best available defenses were that the murder was not a capital offense because it was not committed in the course of a felony, and, should that fail, that there were sufficient mitigating circumstances provable in the penalty phase to avoid a sentence of death. Even in hindsight, that judgment cannot be faulted.

There was, however, tension and even conflict between Wood and his chief trial counsel over Wood's demand that the defense be based on his not having killed Aasved. Because of that disagreement, defense counsel made no opening statement, and other points of conflict arose during the course of the trial as to the examination and calling of certain witnesses. Wood also refused to cooperate with a psychiatrist because he thought the psychiatric evidence would be used to assist counsel in his tactics and therefore would be inconsistent with Wood's claim of innocence.

■ Trial tactics lie within the prerogative of counsel and may not be dictated by his client. Decisions as to what witnesses to call, what objections to make, and, by and large, what defenses to interpose, are generally left to the professional judgment of counsel. See *State v. Gray*, Utah, 601 P.2d 918 (1979); *State v. Pierren*, Utah, 583 P.2d 69 (1978); *State v. McNicol*, Utah, 554 P.2d 203 (1976); *State v. Ames*, 222 Kan. 88, 563 P.2d 1034 (1977).

■ Nevertheless, an attorney acts as an assistant for his client, and not as a master. An attorney who refuses to present such a basic claim as that of innocence acts outside the duties of an attorney, even if the claim of innocence detracts from other defenses presented by counsel. In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court held that a defendant has a right under the Sixth Amendment to represent himself in a criminal prosecution—a right made explicit by the Utah Constitution, Article 1, § 12. In *Faretta*, 422 U.S. at 820, 95 S.Ct. at 2533, the Court stated:

> The counsel provision supplements this design. It speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally.

---

**25.** Apparently, out of an abundance of caution, it was the prosecution that proposed the intoxication instruction. The trial court's refusal to give the instruction was over defendant's objection.

**26.** He does not specify whether the argument is made under the Sixth Amendment to the United States Constitution or Article I, § 12 of the Utah Constitution.

Although Wood could have stood on the right to represent himself and rely on the defense of innocence, he would most likely have severely prejudiced himself. Indeed, self-representation is almost always likely to be detrimental to a defendant, no matter how intelligent or well educated he may be. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

■ There may be rare occasions when an innocent person, trapped by perjury, mistaken testimony, or an unlikely web of circumstances, insists on asserting what in truth is a valid defense of innocence but which, on the basis of the evidence, is highly tenuous or unlikely. To avoid forcing a defendant to resort to self-representation to assert a defense of innocence, an attorney should present such a defense when insisted upon by a client, even though against the better judgment of the attorney, as long as it is done within the ethical and lawful constraints imposed upon attorneys.

■ We adhere to the rule that "to compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever." *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970). However, the attainment of complete harmony in this case could only have been accomplished by counsel's noncompliance with his professional responsibilities, and the probability of a later attack on appeal based on incompetence of counsel.

■ Nevertheless, Wood was not deprived of his defense of innocence. Counsel attempted to contact the witnesses suggested by Wood,[27] and Wood was placed on the witness stand to tell his story and present his defense, with defense counsel conducting his direct examination. It is of no

moment that counsel advised against his taking the stand. Counsel acceded to Wood's request, and Wood was able to give his testimony.

Nor did counsel fail to investigate innocence as a defense. Wood asserts a failure to call an alibi witness, one Charles Boskey, who, according to Wood, could have testified that Wood called him at the approximate time of the murder. When the matter came up at trial, defense counsel stated to the trial judge:

MR. VAN SCIVER: I have interviewed that witness, he is also charged in an ancillary matter. His name is Charles Boskey. I have talked to Mr. Boskey, Mr. Boskey says he got a phone call from Mr. Wood, he thinks at approximately 1:00 a.m. He was intoxicated at that time, he didn't know whether it was a long distance or local phone call. In my judgment, that witness does not constitute an alibi and . . .

THE COURT: No, that wouldn't . . .

At another point during the course of the trial, Wood insisted that trial counsel ask Johann where he had acquired Aasved's credit cards, even though counsel informed Wood that counsel knew what the answer would be and that it would be unfavorable. Upon Wood's insistence, the question was asked, and the damaging answer elicited.

It was not until the fourth day of the trial, near the close of the prosecution's case in chief, that Wood asked the court to appoint other counsel to represent him. The request was denied at that point because it came too late and because the trial judge was convinced that an adequate defense was being offered.

We find no error in the ruling.

### III. CONCLUSION

We reiterate the judgment of our September 21, 1981, per curiam decision: "The

---

27. The results of the interview with Charles Boskey, one of the witnesses, is related in the text. In addition, Wood suggested the names of several witnesses in California who supposedly would have testified to his claimed suicidal depression. Counsel made an effort to reach those witnesses, but was unsuccessful. However, even if they had testified in the manner Wood indicated, it is extremely unlikely that their testimony would have been of value (especially in light of Wood's failure to cooperate with the psychiatrist arranged for by counsel). There is no basis to think that their testimony would have had any effect on the trial.

defendant's conviction of first degree murder is affirmed, but his sentence of death is vacated and the case is remanded to the trial court to resentence the defendant in accordance with U.C.A., 1953, § 76–3–207(3)," which requires the imposition of a life sentence because of prejudicial error committed in the sentencing phase.

OAKS and DURHAM, JJ., and ALLAN CROCKETT, Retired Justice, concur.

HALL, Chief Justice (concurring in the result):

I concur in affirming the defendant's conviction.

In regard to the issues raised on appeal pertaining to the sentencing phase of the trial, I view as dispositive the fact that the trial judge erred in refusing to apply the standard of proof of beyond a reasonable doubt in determining the sentence to be imposed upon the defendant. I therefore concur in the result reached by the majority of the Court which remands this case to the trial judge for the purpose of resentencing in accordance with the provisions of U.C.A., 1953, 76–3–207(3).

HOWE, J., does not participate herein.